In re NUMBER NINE VISUAL TECH-
NOLOGY CORP. SECURITIES
LITIGATION.

No. CIV. A. 96–11207–WGY.

United States District Court,
D. Massachusetts.

June 1, 1999.

**4**

Thomas R. Murtagh, John Sylvia, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, for John J. Foley, Consolidated Plaintiffs.

Thomas R. Murtagh, John Sylvia, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., James W. Prendegrast, Jeffrey B. Rudman, Hale & Dorr, Brian E. Pastuszenski, Christine A.S. Chung, Testa, Hurwitz & Thibeault, Boston, for Andrew Najda, Stanley W. Bialek, Number Nine Visual Technology Corporation, Cowen & Co., Unterberg Harris, Robertson, Stephens & Co., Defendants.

### MEMORANDUM AND ORDER

YOUNG, Chief Judge.

Remember when we were One Ls? How the civil procedure professors extolled the virtues of notice pleading? *See, e.g.,* Jack H. Friedenthal, Mary Kay Kane & Arthur R. Miller, *Civil Procedure* § 5.7, at 253 (2d ed.1993). This case writes a sad (and overlong) epitaph to that era. Who could have expected that, in little over half a century, society would become so chary of dealing with cases on the merits that the law, like some ancient amphibian, would begin to slip back into the primeval ooze of common law forms of pleading?

### I. *Introduction*

This securities class action is brought on behalf of all persons who purchased shares of common stock of the defendant Number Nine Visual Technology Corp. ("Number Nine") in or traceable to Number Nine's initial public offering (the "Offering") of May 26, 1995, and all persons who purchased or otherwise acquired shares of Number Nine common stock between May 26, 1995 and January 31, 1996 (collectively, the "Class").[1] The defendants (collectively, the "Defendants") in this action are (1) Number Nine, (2) a group of individuals who were principals in Number Nine (the "Insiders"), (3) a group of individuals who served as outside directors on the board of directors of Number Nine (the "Outsiders"), and (4) Robertson, Stephens & Co., Cowen & Co., and Unterberg Harris (collectively, the "Underwriters"). Two principal claims are brought in the Consolidated Class Action Complaint (the "Complaint"). First, the Class has alleged that the Defendants violated Section 11 of the Securities Act of 1933 ("the Securities Act") through misrepresentations and omissions contained in the Prospectus for the Offering (the "Prospectus").[2] Second, the Class charges that Number Nine and the Insiders, through certain misrepresentations and omissions, violated Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), and Rule 10b–5 promulgated

---

1. The Class is so divided because two primary claims have been brought, one under the Securities Act of 1933 and one under the Securities Exchange Act of 1934.

2. The Complaint also brings a count against the Insiders as "controlling persons" under Section 15 of the Securities Act, premised on the same allegations underlying the Section 11 claim.

thereunder by the Securities Exchange Commission.[3]

Each defendant has moved to dismiss all claims brought against it. Although the Securities Act claims and the Exchange Act claims primarily rely on the same factual allegations, they are subject to different pleading standards. Moreover, even within the Securities Act claims, different allegations are subject to different standards under controlling First Circuit precedent. Thus, this Memorandum engages in detailed and seemingly repetitive analysis, and also renders seemingly conflicting rulings. Specifically, the Court GRANTS the motions to dismiss the claims under Sections 11 and 15 of the Securities Act insofar as those claims rely on factual allegations *other than* Number Nine's inability to obtain memory supplies at the time of the Offering. The Court further GRANTS the motions to dismiss the claims under Section 10(b) and 20(a) of the Exchange Act insofar as those claims rely on factual allegations *other than* Number Nine's alleged overvaluation of inventory.

## II. *Factual Background*

Taking all allegations in the Complaint as true and granting all reasonable inferences in favor of the Class, *see Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 274 (D.Mass.1998) ("*Shiva* "), the following tale of corporate malfeasance emerges:

### A. *The Offering*

Number Nine is a Massachusetts corporation engaged in the design and manufac-

ture of graphics accelerator cards for personal computers. *See* Compl. ¶¶ 14, 16. During the relevant time periods, Number Nine's principal products included: (a) a 128–bit family of products known as the "Imagine 128"; (b) two 64–bit products including the newer 64–bit 9FX card and the older 64–bit GXE card; and (c) an obsolete 32–bit GXE family of products.[4] *See id.* at ¶ 16(c). In the Prospectus, Number Nine reported inventory of $17,-333,000 as of the close of the first quarter of 1995 (the last full quarter prior to the Offering). *See id.* at ¶ 37. Included in that inventory were millions of dollars of inventory of "(a) 64–bit VL Bus graphics accelerators that were rapidly approaching obsolescence and (b) excess printed circuit boards that Number Nine could not realistically hope to sell at a cost even approaching the cost of producing those products." *Id.* Despite the dubious value of this inventory, Number Nine admitted in the Prospectus that it only carried an "immaterial" provision for excess and obsolete inventory on April 1, 1995. *See id.* This representation violated several generally accepted accounting principles ("GAAP"), including the principle that inventory must be carried at the lower of cost or market. *See id.* at ¶ 38(e). Moreover, by failing to include a write-down of Number Nine's inventory of 64–bit VL bus products and printed circuit boards, the financial statements included in the Prospectus materially overstated Number Nine's inventory, net income, earnings per share, and stockholder equity.[5] *See id.* at ¶ 39.

---

3. The Complaint also brings a count against the Insiders as "controlling persons" under Section 20(a) of the Exchange Act, premised on the same allegations underlying the Section 10(b) claim.

4. The more "bits" a graphics card has, the faster it theoretically is capable of processing data. The market for computer processors, including graphics cards, seems to follow one simple, overriding mantra: faster is better. The mere introduction of a faster accelerator card can have the effect of rendering earlier products "obsolete" in the retail sense, de-

spite the fact that they function no differently than they did on the day they were "cutting-edge."

5. Number Nine also made the following representations in the Prospectus, each of which were rendered false due to the failure to accurately report inventory value: (a) that "[a]ll adjustments ... have been made which, in the opinion of management, are necessary for a fair presentation," (b) that "[i]nventories are stated at the lower of cost or market," and (c) that "[i]n providing for excess or obsolete inventories, [Number Nine] considers the ef-

**6**

The Prospectus also represented that Number Nine's product line represented a broad and diversified range of products that "facilitate[ ] the penetration of the retail channel by spanning a range of prices, beginning at $150 and extending to $2,000." *Id.* at ¶ 43. This representation was false and misleading because, at the time it was made, Number Nine's inventories were overstocked with 64–bit VL bus products which were "rapidly becoming obsolete," and Number Nine's competitors "were offering significantly less expensive alternatives to [Number Nine's] high-priced Imagine 128 products that offered features such as 3–D graphics and superior motion video which were not available in Number Nine's products." *Id.* at ¶ 44(a). Moreover, the second generation Imagine II line of products, which Number Nine specifically touted in the Prospectus as an example of its broad product line, was experiencing numerous difficulties in technical development which precluded Number Nine from meeting its announced 1995 shipment date. *See id.* at ¶ 44(b).

Number Nine also misrepresented the expected profitability of its main product offerings. Specifically, Number Nine stated in its Prospectus that margins could increase through (a) potential cost reductions from efficiency gains and volume purchasing, (b) potential changes in product mix toward a greater concentration of higher-margin products like the Imagine 128 line, and (c) potential changes in its distribution methods. *See id.* at ¶ 45. These representations were false and misleading for a number of reasons. First, recalling the inflated value at which 64–bit VL bus cards were carried on the books, Number Nine's margins were certain to decline in light of the impending and inevitable inventory markdown. Second, Number Nine's proposed Imagine 128 card for the Apple PowerMac, a product which Number Nine relied upon for at least part

of its expectation of increased margins, was experiencing significant production delays that would cause Number Nine to lose millions of dollars in high-margin sales due to its failure to fill outstanding orders. Finally, Number Nine knew that it was unable to procure needed DRAM and VRAM memory chips from its normal suppliers, and instead had to turn to the much more expensive "spot market" for the parts. Relying on such alternative sources for memory chips significantly increased the cost of goods sold and therefore was hurting Number Nine's margin by the time of the Offering. *See id.* at ¶ 46.

This failure to disclose the problem of obtaining memory chips also appeared in the "Risk Factors" section of the Prospectus. Number Nine did disclose that memory shortages "have from time to time required the Company to obtain memory from distributors or on the 'spot market' at higher than anticipated prices," and that "[a]ny shortage of [memory chips] in the future could materially adversely affect" results. *Id.* at ¶ 47. Number Nine did not disclose, however, that it was experiencing just such a shortage of supply at the time the Prospectus was signed and the Offering was made. Nor did it disclose that it was resorting to alternative sources of memory chips that were significantly more costly than its normal suppliers, and that this increased cost could only be passed on to consumers to a limited extent, given the competitive nature of the graphics accelerator market. Finally, Number Nine failed to disclose that the memory crunch also caused it to fail to fill some orders and, consequently, some customers, including Number Nine's largest customer, sought alternate suppliers for graphics accelerators. For all of these reasons, many of the key financial measures included in the Prospectus were misleading at the time they were made. *See id.* at 48.

---

fects of planned new product introductions, anticipated stock rotations and sales activity."

*Id.* at ¶¶ 41, 42.

B. *Post–Offering Misrepresentations*

The Complaint also alleges a variety of misrepresentations and omissions that form the basis, along with the above facts, for the claims under the Exchange Act.

Following the Offering, Number Nine issued additional financial reports—a July 27, 1995 press release, a second quarter 1995 Form 10–Q filing, and a third quarter 1995 Form 10–Q filing—that contained misrepresentations and omissions similar to those contained in the Prospectus. *See id.* at ¶¶ 49–57. Certain allegedly actionable statements by individuals were also made. For instance, in the July 27, 1995 press release, Andrew Nadja ("Nadja"), president, chief executive officer, and chairman of the board of Number Nine, is quoted as stating that Number Nine experienced difficulties obtaining memory chips during June. *See id.* at ¶ 59. In actuality, however, Number Nine experienced such difficulties well before the Offering took place on May 26, 1995. Likewise, an August 7, 1995 press release plugged the company's forthcoming Imagine 128 product for Apple PowerMac, noting specifically that "[v]olume shipments ... are currently anticipated to begin in September 1995." *Id.* at ¶ 62. On September 26, 1995, Number Nine trumpeted certain distribution agreements relative to its Imagine 128 for PowerMac product, again stating that shipment would begin immediately. *See id.* at ¶ 66. These representations were misleading in light of the fact that Number Nine was experiencing delays in producing the Imagine 128 for PowerMac that would prevent shipment until late November 1995. *See id.* at ¶ 63. Moreover, as a result of the delay, Number Nine would lose millions of dollars in potential sales as competitors usurped the brief and lucrative opportunity to capture the Macintosh market share.

An October 6, 1995 press release disclosed that Number Nine would not meet analysts' forecasts. *See id.* at ¶ 69. The same release, however, made much of the company's $22,000,000 in backlog orders, apparently as evidence that "sales will increase significantly in the fourth quarter." *Id.* at ¶¶ 70, 71. In truth, however, Number Nine knew that a large portion of the $22,000,000 in backlog orders was for the Imagine 128 PowerMac product, and that those orders had been placed on the assumption that Number Nine would be able to ship the 128–bit product ahead of its competitors. *See id.* at ¶ 72(a). At the time of its October 6 representation, Number Nine knew or recklessly disregarded the fact that its was experiencing significant delays with its PowerMac products, that its competitors would beat it to market, and that consequently, much of the $22,000,000 order backlog would not become sales in the fourth quarter. *See id.* at ¶ 72(b).

Finally, in an October 25, 1995 press release, the company stated that "[b]ased on increased OEM orders, historic seasonal demand in the fourth quarter, and the introduction of the Apple PowerMac version of Imagine 128, we currently expect sales to increase significantly from the third quarter." *Id.* at ¶ 80. This projection was misleading for a variety of reasons. In addition to those already identified with respect to other misleading statements, Number Nine's October 25 statement was misleading because high-margin Imagine 128 products were comprising an increasingly smaller percentage of the company's sales. *See id.* at ¶ 82(a). Moreover, the company's margins were also decreasing due to the fact that its sales were being made to an increasingly concentrated group of customers, while its costs were simultaneously "skyrocketing." *See id.* at ¶¶ 82(b)-(c). At the same time, Number Nine was experiencing significant difficulty in bringing its second generation Imagine II product to market. Contrary to the Prospectus' representation that Imagine II products would be shipped in 1995, no production shipments were made until the second quarter of 1996 and even those shipments suffered from a serious design flaw that increased the product's

cost and seriously hampered its marketability. *See id.* at ¶ 82(d). Finally, other nondisclosed information made the October 25 statement misleading, including the fact that Number Nine had lost approximately $4 to $5 million in sales from its largest customer, and the fact that sales through the retail distribution channel had declined approximately $1 million on a sequential basis from the third quarter 1995. *See id.* at ¶¶ 82(e)-(f).

### C. *Communications Through Analysts*

The Class also makes a variety of allegations regarding misrepresentations that Number Nine accomplished through the use of securities analysts. *See id.* at ¶¶ 83–107. Specifically, the Class alleges that Number Nine embroiled itself in a network of communications with analysts for the ultimate purpose of disseminating false and misleading information to the market. Thus, the Class seeks to hold Number Nine and the Insiders responsible for a variety of misleading statements contained in various analysts' reports.

### D. *The Unraveling*

Finally, on January 31, 1996, Number Nine announced that it was forced to report $8 million of charges "primarily for excess inventory." *Id.* at ¶ 109. This charge, which was specifically necessitated by Number Nine's carrying VL bus graphics cards and excess printed circuit boards at inflated values, resulted in a net loss that exceeded the company's cumulative net income for at least the previous five years. *See id.* at ¶ 110. Overall, during the relevant time period, the price of Number Nine's common stock rose from its offering price of $15.00 to a high of $25.00 per share on July 7 and 8, 1995, and then fell drastically within only six months to $5.125, the price at which it traded following the company's revelations. *See id.* at ¶ 120. In other words, by the end of the relevant time period, the Class' shares had lost approximately eighty percent of their value from the market high.

### III. *Analysis*

### A. *Standard of Review*

In reviewing a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Shiva,* 27 F.Supp.2d at 274 (quoting *Monahan v. Dorchester Counseling Ctr.,* 961 F.2d 987, 988 [1st Cir.1992] ). The Court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus.,* 814 F.2d 22, 25 (1st Cir. 1987) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957] ).

■ In a securities action, two additional considerations bear upon the motion to dismiss: Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). Rule 9(b) imposes a heightened pleading requirement on plaintiffs alleging fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). The PSLRA makes the pleading standard in securities fraud cases even more rigorous than Rule 9(b). Under the PSLRA a complaint alleging securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, in order sufficiently to allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2). When a complaint fails to meet the above two requirements, dismissal is required. *See id.* at § 78u–4(b)(3)(A).

■■ "Such heightened scrutiny is hardly new to this Circuit, which traditionally has set the bar for securities plaintiffs quite high under Rule 9(b)." *Shiva,* 27 F.Supp.2d at 275; *accord Gross v. Summa Four, Inc.,* 93 F.3d 987, 991 (1st Cir.1996) ("We have been especially strict in demanding adherence to Rule 9[b] in the securities context ...."); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991) ("We have been especially rigorous in demanding such factual support in the securities context ...."). To support properly an allegation of fraud, pleadings must go beyond mere information and belief to specify the source of the information and the reasons for the belief. *See Romani,* 929 F.2d at 878; *New England Data Servs. v. Becher,* 829 F.2d 286, 288 (1st Cir.1987). Thus, a complaint alleging fraud must specify (1) the statements that the plaintiff contends were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 [2d Cir.1994] ).

■ "Furthermore, as to scienter, the courts of this Circuit already require a securities plaintiff 'to allege facts that give rise to a strong inference of fraudulent intent.'" *Shiva,* 27 F.Supp.2d at 275 (quoting *Suna,* 107 F.3d at 68) (citations and internal quotation marks omitted). A securities plaintiff must allege "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992). Citing the *Greenstone* language, the First Circuit recently noted that "we do not interpret the [PSLRA] standard to differ from that which this court has historically applied." *Maldonado v. Dominguez,* 137 F.3d 1, 9 n. 5 (1st

Cir.1998) (citing *Greenstone,* 975 F.2d at 22).

## B. *Standing*

### 1. *The Defendants' Argument*

■ The Underwriters and the Outsiders assert that the Class lacks standing to bring claims against them under Section 11 of the Securities Act. Because the Class has only alleged that they purchased shares "in or traceable to the [Offering]," Compl. ¶¶ 1, 15, 29, 162, 170, the Underwriters and the Outsiders do not think that the standing requirements of *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995),[6] have been satisfied. Instead, they believe that a plaintiff must show that shares were purchased "in" a public offering; that is, "pursuant to a registration statement and through a transaction requiring the delivery of a prospectus." Outsiders Mem. at 13 (citing *Gould v. Harris,* 929 F.Supp. 353, 358 [C.D. Cal.1996]; *Gannon v. Continental Ins. Co.,* 920 F.Supp. 566, 575 [D. N.J. 1996]; *Murphy v. Hollywood Entertainment Corp.,* No. CIV. 95–1926–MA (LEAD), 1996 WL 393662, at *2–4 [D. Or. May 9, 1996]; *In re Valence Tech. Sec. Litig.,* No. C 95–20459JW, 1996 WL 37788, at *4 [N.D. Cal. Jan. 23, 1996] ). More specifically, the Underwriters and the Outsiders argue that Section 11 of the Securities Act does not "extend[ ] to securities purchases that are merely 'traceable' to the offering. Under *Gustafson,* Section[ ] 11 appl[ies] only to purchases made in the initial offering ...." *Gould,* 929 F.Supp. at 359. These and other district court cases support the Underwriters and the Outsiders' position that, following *Gustafson,* there is no standing under Section 11 for plaintiffs who purchased securities in aftermarket trading.

*See, e.g., Gould v. Harris,* 929 F.Supp. 353, 358 (C.D.Cal.1996) ("The *Gustafson* reasoning is equally applicable to claims arising under § 11.").

---

**6.** Although *Gustafson* specifically addressed only Section 12(2) of the Securities Act, some courts have interpreted the standing requirement to apply with equal force to Section 11.

Among the named plaintiffs, only one actually purchased shares on the date of the Offering and at the Offering price. Moreover, at the time of the Offering, some 195,948 shares of Number Nine common stock were eligible for immediate sale to the public without registration under Rule 144(k). Thus, the Underwriters and the Outsiders argue that the Class could have purchased shares that did not require delivery of the Prospectus, either because the Class members purchased some of the Rule 144(k) shares or because they bought shares in aftermarket trading. Accordingly, the Underwriters and the Outsiders argue that dismissal is appropriate.

### 2. *The Class' Argument*

The Class argues against dismissal for several reasons. First, they claim that plaintiff Robert Schoenhofer ("Schoenhofer") in fact purchased 100 shares of Number Nine stock from one of the Underwriters, and they offer to amend the Complaint to plead these facts. Second, they believe that Section 4(a)(3) of the Securities Act, when read in conjunction with Rule 174(d) promulgated thereunder by the Securities Exchange Commission, requires that a prospectus be delivered to all persons who purchase securities within twenty-five days after completion of a public offering for a company that was not previously subject to reporting obligations. Thus, the argument goes, because plaintiffs Schoenhofer and RBI purchased their shares within twenty-five days of the Offering, they were legally entitled to receive a copy of the Prospectus and should be deemed to have standing even under the Underwriters and the Outsiders' interpretation of *Gustafson.*

Finally, the Class takes issue with the Underwriters and the Outsiders' characterization of the relevant case law. Rather than expressly abolishing the "traceable"

aspect of securities standing under Section 11, as the Underwriters and the Outsiders claim, the Class argues that *Gustafson* simply did not address the issue. According to the Class, *Gustafson* dealt with the substantive requirements of a Section 12(2) claim, noting that a claim could only be brought when there had been a public offering. *See Gustafson,* 513 U.S. at 569, 115 S.Ct. 1061. Admittedly, this aspect of the case seems directly relevant to a Section 11 claim. That does not, however, mean that Section 12(2) *standing* principles should also be incorporated into Section 11 analysis, as the District Court of California appears to have done in *Gould.* Indeed, the Class argues, there are many reasons to retain "traceable" standing under Section 11 while not permitting it under Section 12(2).

First, the text of the actual statute seems to require it. Section 11(a) provides that "any person acquiring such security" may sue on a false registration statement, and even provides that a person acquiring a security more than a year after a registration statement becomes effective can sue if she proves that she relied on untrue statements contained therein. 15 U.S.C. § 77k(a). Additionally, the measure of damages provided in Section 11(e) clearly contemplates that people may purchase at a rate higher than the offering price and, hence, also contemplates that aftermarket purchasers can sue under Section 11.[7] Second, the legislative history of Section 11 makes clear that the statutory remedy was intended to protect purchasers "regardless of whether they bought their securities at the time of the original offer or at some later date (so long as those shares were issued on the offering)." H.R.Rep. No. 85, 73rd Cong., 1st Sess. 7 (1933). Third, respected commentators appear to reject the *Gould* position that "traceable" standing no longer applies under Section

---

7. In contrast, section 12(2) seems to contemplate only standing by those who purchase directly in a public offering. It provides that a person who "offers or sells a security ... by means of a prospectus or oral communica-

tion" which includes a material misrepresentation or omission "shall be liable ... *to the person purchasing such security from him.*" 15 U.S.C. § 77l (emphasis added).

11. *See* IX L. Loss & J. Seligman, *Securities Regulation* 4249 (3d ed. 1995) ("Suit may be brought by any person who acquired a *registered* security, whether in the process of distribution or in the open market.") (emphasis in original).

Thus, the Class asks the Court to reject the *Gould* court's interpretation of *Gustafson* and retain the First Circuit's established view that standing is proper under Section 11 whenever a plaintiff's shares are "traceable to" an initial public offering. *See, e.g., Versyss Inc. v. Coopers & Lybrand,* 982 F.2d 653, 654 (1st Cir.1992) (purchaser may bring a Section 11 action even when shares were acquired from individual shareholders in a merger subsequent to an initial public offering). If the Court does so hold, then standing is proper as to all named plaintiffs, even those who purchased securities after the twenty-five day period following the Offering.

### 3. *Analysis*

Because the parties briefed these motions over a year ago, they cited neither of the recent thoughtful opinions by Judge Woodlock and Judge O'Toole on this very issue. In *Cooperman v. Individual, Inc.,* No. 96–12272–DPW, 1998 WL 953726 (D.Mass. May 27, 1998), *aff'd on other grounds,* 171 F.3d 43 (1st Cir.1999), Judge Woodlock addressed an argument that *Gustafson* had effectively overruled the "traceable to" formulation of standing under Section 11. In rejecting the argument, Judge Woodlock first acknowledged that the district courts have split on the issue. He also indicated that the holding of *Gustafson* with respect to Section 12(2) should apply with equal force to Section 11. "As a result, however, it is critical that the holding be characterized accurately." *Id.* at *5. Notably, "*Gustafson* was a

decision not on standing, but rather on the substantive elements of a § 12(2) action." *Id.* at *6. The Supreme Court simply held that for Section 12(2) liability to attach, a misrepresentation must be made in an initial public offering, not other types of transactions. "In other words, the Court held that there is no right of recovery for misrepresentations in the aftermarket, but it did not preclude an aftermarket purchaser from recovering for misrepresentations in an [initial public offering]." *Id.*

Because *Gustafson* did not control his decision, as the defendants claimed, Judge Woodlock simply reaffirmed existing First Circuit standing jurisprudence for Section 11 suits.[8] "Specifically, the text, structure, and history of § 11 demonstrate that, rather than mirroring the privity requirement of § 12(2) and focusing upon the sale transaction, § 11 focuses upon the offered security itself, which becomes—and remains—a security registered pursuant to other provisions of the 1933 Act." *Id.* Consequently, Judge Woodlock held "that Plaintiffs have standing under Section 11 if they purchased shares registered through the registration statement at issue—i.e., if their shares are 'traceable to' the public offering." *Id.* at *7.

An identical result was reached by Judge O'Toole in *In re WebSecure, Inc. Securities Litigation,* 182 F.R.D. 364 (D.Mass.1998). After analyzing the *Gustafson* decision in much the same manner as Judge Woodlock, Judge O'Toole concluded, "[t]o plead proper standing under § 11, a plaintiff may plead a purchase in the public offering itself or a purchase traceable to the offering and its Registration Statement." *Id.* at 368.

This Court joins its District of Massachusetts colleagues[9] in holding that a

---

8. Indeed, Judge Woodlock felt "bound by the First Circuit's adoption of [the 'traceable to'] analysis," given that *Gustafson* did not alter First Circuit precedent. *Cooperman,* 1998 WL 953726, at *7.

9. *But see Zeid v. Open Envtl. Corp.,* No. 96–12466–EFH, slip op. (D.Mass. December 16,

1997) (Harrington, J.) (*citing Gustafson,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1) (dismissing all securities claims brought under section 11 except one plaintiff's, who "purchased his stock at the initial public offering.")

plaintiff may satisfy Section 11 standing requirements by purchasing securities "traceable to" an initial public offering. Because the Class alleges as much in its Complaint, the Court DENIES the motions to dismiss for lack of standing.

### C. *The Claim under Section 11 of the Securities Act*

#### 1. *Whether Rule 9(b) Applies*

■ The parties dispute whether Fed. R.Civ.P. 9(b) applies to the claim under Section 11. Essentially, the determination comes down to whether that count of the Complaint "sounds in fraud." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir.1996) (noting that when a complaint asserting violations of Section 11 "sounds in fraud," the otherwise inapplicable requirements of Rule 9[b] are triggered). The Court addressed this issue in *In re Computervision Corporation Securities Litigation*, 869 F.Supp. 56 (D.Mass. 1994), *aff'd on other grounds sub nom. Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir.1996). After reviewing several of the key allegations from the complaint in *Computervision*, which together charged the defendants with engaging in a scheme to purposefully "dump" stock on an unsuspecting public at inflated prices, the Court concluded that "[t]hese are clearly allegations of fraud perpetrated on the investing public, so the particularity requirements of Rule 9(b) apply." *Id.* at 64. Because they believe that the allegations in this case are more fraud-like in nature than those at issue in *Computervision*, the Defendants argue that this Court must hold the Class to the demands of Rule 9(b).

A subsequent case from the First Circuit has significantly changed the picture with respect to the level of alleged conduct that will suffice to make a complaint "sound in fraud." In *Shaw*, the First Circuit addressed the issue as follows: "Although the complaint [at issue] does assert that defendants actually possessed the information that they failed to disclose, those allegations cannot be thought to constitute 'averments of fraud,' absent any claim of scienter and reliance. Otherwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud for purposes of Rule 9(b)." *Shaw*, 82 F.3d at 1223. Thus, in order to prevent Section 11 claims from becoming analytically indistinct from 10(b) claims, courts must ensure that the former truly do "sound in fraud" before the heightened pleading standard associated with the latter attaches.

The Complaint appears to have been crafted with these considerations in mind. Indeed, the claim under Section 11 of the Securities Act expressly excludes "(a) paragraphs 126–60 [relating to scienter of Number Nine and the Insiders for the 10(b) claim] (b) any element of any paragraph that alleges that defendants' misconduct was done intentionally, knowingly or with reckless disregard for the truth; or (c) any element of a paragraph that otherwise sounds in fraud." Compl. ¶ 161. Courts differ in deciding whether to credit such disclaimers. *Compare In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n. 2 (9th Cir.1996) (holding that Rule 9[b] applies despite presence of disclaimers because "[t]hese nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus") *with In re AnnTaylor Sec. Litig.*, 807 F.Supp. 990, 1003 (S.D.N.Y.1992) (holding that "[s]ince plaintiffs disavow any claim of fraud ... in Count I [alleging Section 11 liability], it need not comply with Rule 9[b].").

This Court holds that Counts I (Section 11) and II (Section 15) of the Complaint do not "sound in fraud" and are therefore not subject to the heightened pleading standards of Rule 9(b). There are two alternative reasons for so holding. First, the Court rules that the Complaint's disclaimer of fraud-type allegations is effective to prevent the Securities Act claims from

"sounding in fraud." This will minimize litigation costs by ensuring that plaintiffs need file only one complaint and one civil action to pursue their securities claims. The Court emphasizes, however, that the Class will be held to its word; that is, in pursuing the Securities Act claims, the Class can in no way rely on allegations of conduct that "sound in fraud." Thus, when litigating the Securities Act claims, the Class cannot rely on any evidence suggesting that the conduct of Number Nine, the Insiders, the Outsiders, or the Underwriters was done knowingly, intentionally, or with reckless disregard for the truth, or was otherwise fraudulent.[10]

Second, the Court rules that, even ignoring the Complaint's disclaimer, the allegations under Counts I and II do not "sound in fraud" because they "appear to contend only that there was a negligent or even innocent misrepresentation." *Cooperman*, 1998 WL 953726, at *7 (holding that Rule 9[b] does not apply to a Section 11 claim); *accord In re WebSecure*, 182 F.R.D. at 367 (holding that Rule 9[b] did not apply to Section 11 and 12[a][2] claims because no allegations of scienter were made). The most damning allegation that the Defendants can muster from the Complaint is that "it was apparent that the Registration Statement contained materially false and misleading statements which a reasonable and diligent investigation would have uncovered." [11] Compl. ¶ 169. This allegation, however, merely tracks the language of Section 11(b)(3) of the Securities Act to negate the "due diligence" defense. Moreover, it does not contain allegations that

the Defendants *knew* the false or misleading character of their statements. Thus, the Court holds that Rule 9(b) does not apply to the claims under the Securities Act, both because the Complaint expressly excludes all allegations of fraudulent conduct for purposes of Counts I and II, and because even without the disclaimer those counts merely allege "that defendants actually possessed the information that they failed to disclose." *Shaw*, 82 F.3d at 1222.

### 2. The Value of Inventory

■ Although Rule 9(b) does not apply to the Securities Act claims, the requirements of the PSLRA still do. Thus, the Class must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b). Naturally, the Defendants argue that these requirements have not been met. For expositional clarity, this Memorandum addresses these arguments separately with respect to each group of allegations, examining whether the group is supported by sufficient facts to survive a motion to dismiss.

First, the Class contends that the Prospectus contained several misleading statements because certain 64-bit VL bus inventory was carried on Number Nine's books at a value far exceeding its true market worth. *See* Compl. ¶ 37 (noting that "64-bit VL Bus graphics accelerators

---

10. As will be seen, this requirement has bite. Because the Class specifically disavows pertinent evidence with respect to its Section 11 claim regarding inventory obsolescence, the Court dismisses the Section 11 claim on that issue even though the Section 10(b) claim survives. *See infra* Section III(E)(1). Of course, the Class is free to seek leave to amend its Complaint to include the determinative evidentiary allegations under the Section 11 claim.

11. The Defendants also make much of the opening to the Complaint, in which the Class

describes its action as "a securities fraud class action." Compl. ¶ 1. Such precatory language, however, does not alter the underlying substance of the Complaint. Just as the Class could not purge fraudulent content from a complaint that truly did "sound in fraud" simply by injecting an introductory description to the contrary, the Class' designation of this action as one of "securities fraud" does not condemn it to comply with Rule 9(b) when the Complaint does not otherwise "sound in fraud."

... were rapidly approaching obsolescence" at the time of the Offering). The Class has sufficiently identified the misleading statements (a number of representations from the Prospectus that GAAP principles have been followed and the financial figures are otherwise accurate), and why they were allegedly misleading (because they overstated the value of inventory on hand, thereby artificially elevating the perceived worth of the company prior to its Offering). The only remaining question is whether the Class has alleged a sufficient factual basis for these claims, and as the First Circuit has noted, "it is plaintiff's responsibility to plead factual allegations, not hypotheticals, sufficient to reasonably allow the inference that the defendants [engaged in the alleged conduct]." *Glassman,* 90 F.3d at 629.

The Defendants argue that the Class has merely cited an event—the eventual $8 million markdown of Number Nine's inventory—and reasoned that the inventory must have been overvalued at the time of the Offering some eight months earlier. Such hindsight pleading, they argue, is insufficient to withstand this motion. It is important to note, however, that because the Class is not subject to Rule 9(b) for purposes of the Securities Act claims, this is not the typical case in which the "fraud by hindsight" doctrine applies. *See Gross,* 93 F.3d at 991. ("Furthermore, we have consistently held that a securities plaintiff does not satisfy the requirements of Rule 9[b] merely by pleading 'fraud by hindsight.'") (quoting *Greenstone,* 975 F.2d at 25). *Gross* involved a Section 10(b) claim subject to Rule 9(b) in which the plaintiffs failed to "set forth sufficiently particular facts from which one could reasonably infer that [the defendant] knew about the alleged delays at the time it issued the

[misleading statement]." *Id.* at 995. In the instant case, no such issue is raised as the Court must accept as true the Class' allegation that the Defendants knew about the inferior value of the 64–bit VL bus inventory at the time of the Offering.

Nevertheless, the First Circuit has held that a doctrine similar to the "fraud by hindsight" rule applies in the context of certain Securities Act claims even without the force of Rule 9(b). Specifically, the First Circuit held that "[i]n many circumstances, the relationship between the nonpublic information that plaintiffs claim should have been disclosed and the actual results or events that the undisclosed information supposedly would have presaged will be so attenuated that the undisclosed information may be deemed immaterial as a matter of law." *Shaw,* 82 F.3d at 1211. In light of this language, the Defendants argue that the crucial issue with respect to the inventory becomes whether the alleged misrepresentations in the Prospectus were "sufficiently remote in time or causation from the ultimate events of which [they] purportedly forewarned." *Id.* If so, dismissal is appropriate.[12]

Notably, the *Shaw* court cited, apparently with approval, a string of cases in which dismissal or summary judgment was granted under circumstances similar to the instant case. *See In re VeriFone Sec. Litig.,* 11 F.3d 865, 867–70 (9th Cir.1993) (affirming dismissal of claim that registration statement failed to disclose information concerning development that came to light six months later); *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1439, 1450 (5th Cir.1993) (affirming summary judgment when prospectus allegedly failed to disclose information of developments that matured four months later); *In re Convergent Techs. Sec. Litig.,* 948 F.2d 507, 511,

---

**12.** The Defendants also argue that the "bespeaks caution" doctrine should immunize the claims regarding inventory in the Prospectus. The Court rejects this argument, however, as the Class has alleged that inventory was obsolete *at the time of the Prospectus. See Shaw,* 82 F.3d at 1213 ("To the extent that plaintiffs allege that the reserve 'adequacy' statement encompasses [a] representation of present fact, and that such a representation was false or misleading when made, the surrounding cautionary language could not have rendered the statement immaterial as a matter of law.").

517 (9th Cir.1991) (same for six month delay); *Zucker v. Quasha*, 891 F.Supp. 1010, 1012–13, 1018 (D.N.J.1995) (dismissal for four and one half month delay), *aff'd* 82 F.3d 408 (3d Cir.1996). The *Shaw* court itself did not follow these cases because in *Shaw*, "the prospectus in question was filed *11 days* prior to the end of the quarter in progress [which turned out to be disastrous]." *Shaw*, 82 F.3d at 1211 (emphasis added). The court simply could not hold, as matter of law, that information foretelling a disastrous quarter need not be disclosed in a prospectus issued a mere eleven days before the end of such quarter. *See id.* Given that the inventory markdown in this case occurred some eight months after the alleged misrepresentations rather than a mere eleven days, the Defendants argue that the implicit spectrum established by *Shaw* mandates dismissal.

While the Defendants rely on this aspect of *Shaw* as controlling, the Class cites another part of the opinion that follows a quite different course. The plaintiffs in *Shaw* also challenged the misleading nature of certain prospectus representations by the defendant that restructuring reserves were adequate to cover presently-planned restructuring activities. While the defendants' March 21, 1994 prospectus stated that existing reserves were adequate, the company nevertheless took an additional $1.2 billion restructuring charge on July 20, 1994. Although this delay was considerably longer than eleven days—indeed it would seem to require dismissal under the implicit spectrum established by the previously cited cases—the First Circuit allowed the plaintiffs to proceed on the claim, pausing only to consider whether the "bespeaks caution" doctrine should immunize the alleged misrepresentations. *See id.* at 1212–14.

The *Shaw* court did not attempt to reconcile the dissonance between these two holdings. Crucial to the analysis seems to have been the fact that the third-quarter results gave rise to a claim of nondisclo-sure, while the restructuring reserve adequacy claim rested on an affirmative misleading statement. *Compare id.* at 1202 ("Actionability of Alleged Nondisclosures Under Section 11") *with id.* at 1211 ("Actionability of Statement Concerning Restructuring Reserves"). While the theoretical chasm between fraud by omission and commission may provide abstract comfort to those seeking principled distinctions in the securities law, to the workaday district judge the chasm often provides only a temptation to jump.

In this case, for instance, the Class has cited a number of affirmative allegations that it believes are actionably misleading based on the failure to disclose the inventory valuation problem. The Court must ask: Are these allegations claims of nondisclosure subject to the exacting treatment that the First Circuit afforded the third quarter results in *Shaw*, or are they claims of affirmative misstatement such as the *Shaw* reserve adequacy claim, which the court apparently looked upon with a more generous gaze? Simply referencing financial statements that were allegedly made misleading by a failure to disclose certain information seems to give securities plaintiffs an easy escape from the heightened *Shaw* standard. Given the continuous reporting requirements of the Securities Exchange Commission, plaintiffs could almost always find some generic GAAP reference or other statement in a company's reports that is allegedly made misleading by nondisclosure of material information. At heart, the Class' claim in this case is one of nondisclosure; yet the Class is able to cite a number of affirmative statements in the Prospectus. This Court will not allow circumvention of *Shaw* in such a manner.

The question therefore remains: How is the Court to distinguish the treatment of the third quarter results from the restructuring reserves in *Shaw*? One way to do so would be to examine the nature of the alleged problem and determine how long such a problem typically takes to develop

and, hence, how early one could reasonably expect a company to know about the problem and incur disclosure obligations (or how early such a problem could have made company statements misleading). *See Cooperman*, 171 F.3d at 48 (contrasting order processing delays, which could not be inferred to exist five weeks prior to board meeting minutes discussing them, with board-level conflicts, which could be inferred to exist at the time of an IPO by the departure of the CEO, past president, and founder of the corporation four and one-half months after the IPO). Thus, information regarding the impending results of a quarter might need only be disclosed when statements are made very near to the end of that quarter. *See Shaw*, 82 F.3d at 1210 (noting that the remainder of a quarter's results can always be different than quarter-to-date information would portend, thus rendering quarter-to-date information less probative the earlier in the quarter it is obtained); *see also Glassman*, 90 F.3d at 632 (refusing to hold that a duty of disclosure attached to negative internal information "only seven weeks into the quarter—and where mid-quarter results were not particularly predictive"); Richard A. Rosen, *The Statutory Safe Harbor for Forward–Looking Statements after Two and a Half Years; Has It Changed the Law? Has It Achieved What Congress Intended?*, 76 Wash. L. Quar. 645, 669 (1998) (opining that *Shaw* and *Computervision* indicate that "the earlier in the quarter is the offering, the less predictive the intraquarter information is likely to be of the actual results"); Note, *Living in a Material World: Corporate Disclosure of Midquarter Results*, 110 Harv. L.Rev. 923 (1998) (discussing *Shaw* and *Computervision* and arguing for refinements in the test of materiality). In contrast, a $1.2 billion restructuring charge is of such magnitude and consequence that its necessity devel-

ops and should be recognized by management over a much longer horizon. Therefore, it is not unreasonable to infer that management knew of impending restructuring necessities some four months before their announcement. In the instant case, then, the question for the Court is whether the alleged inventory problem is of such a nature that it is reasonable to infer its existence at the time of the Offering from a disclosure some eight months later.

At least one other court has addressed this issue. In *In re Starter Corporation Securities Litigation*, No. 94 Civ. 718 TPG, 1996 WL 406624 (S.D.N.Y. July 19, 1996), Chief Judge Griesa dismissed a Section 11 claim predicated upon an inventory markdown some eighteen months after the issuance of a prospectus, noting that "[n]o possible inference can be drawn from these write-downs, occurring long after the prospectus, that the questioned statements in the prospectus about inventory controls were false." *Id.* at *3. The Class attempts to distinguish *In re Starter* because in that case, the adverse disclosures were made eighteen and twenty months after the prospectus and because Rule 9(b) applied.[13] In contrast, the Class in this case alleges an adverse disclosure only eight months after the prospectus and brings Securities Act claims to which Rule 9(b) does not apply. Because it is not at all clear that Chief Judge Griesa based his opinion on the applicability of Rule 9(b), and because the First Circuit has held Section 11 plaintiffs to a standard similar to Rule 9(b) in any event, that aspect of the Class' argument can be safely ignored. Thus, the question truly becomes a judgment call: is the eight month time lag in this case more like the eleven days of *Shaw* or the eighteen months of *In re Starter*?

On that question, and on the allegations as they are currently framed in the Complaint, the Class loses. Ample precedent

---

**13.** The Class also claims that the *In re Starter* plaintiffs *only* pled the eventual inventory write-downs without any supporting allegations. This, however, was not the case. *See*

*In re Starter,* 1996 WL 406624 at *8 (appendix of compiled detailed factual allegations made by plaintiffs).

exists for the proposition that the computer industry is a "field marked by rapid technological advances." *In re Stac Elecs.*, 89 F.3d at 1410 (citation omitted). Indeed, the Court may take judicial notice, *see* Fed.R.Evid. 102, of the fact that a product, such as a 64–bit VL bus graphics card, can go from viability to obsolescence in the retail market in a time span of less than eight months. Thus, the mere announcement, eight months later, of an inventory markdown is not sufficient to raise an inference that inventory was obsolete at the time of the Offering.

Still, this issue is an extremely close one. A comparison with Judge Harrington's opinion in *Friedberg v. Discreet Logic Inc.*, 959 F.Supp. 42 (D.Mass.1997), is instructive.[14] Faced with a nearly identical issue, Judge Harrington was able to deny the motion to dismiss, but only because he found significant *additional* facts to support an inference that the defendant was aware of a problem at the time of its public offering. In *Friedberg*, defendant Discreet Logic, Inc. ("Discreet") manufactured software products that worked in tandem with popular Silicon Graphics ("Silicon") workstations. Some three months after a public offering by Discreet, it announced that its financial results had been "devastated" by the introduction of a new Silicon workstation that rendered Discreet's software obsolete. *See id.* at 45. The question for Judge Harrington was whether the plaintiffs had alleged facts sufficient to support an inference that Discreet was aware of its impending doom at the time of the public offering. He held that the plaintiffs had met their burden, but only because he found significant facts besides the mere announcement some three months later that the problem had occurred. For instance, Discreet touted in its prospectus that it "obtain[ed] advance

access" to Silicon technology as part of a strategic alliance agreement. *Id.* at 44. Also, a Silicon executive was quoted in the Wall Street Journal as saying that Discreet "knew for a long time" that its product would be rendered obsolete and Discreet "could have planned accordingly." *Id.* at 45. Thus, because the defendants were "armed with information that [their] current product line [was] about to become obsolete," *id.* at 50, Judge Harrington was able to find that the "strong inference of scienter" test under Section 10(b) had been met, *see id.* at 51–52.

Although Judge Harrington's opinion focused on the heightened scienter pleading requirements of Section 10(b) claims, the Court nevertheless rules the factual comparison instructive. Accordingly, the Court holds that the Class has insufficiently alleged material misstatements based solely on the subsequent announcement of inventory markdowns by Number Nine. As the First Circuit has made clear, even under Section 11 claims, "the relationship between the nonpublic information that plaintiffs claim should have been disclosed and the actual results or events that the undisclosed information supposedly would have presaged [can] be so attenuated that the undisclosed information may be deemed immaterial as a matter of law." *Shaw*, 82 F.3d at 1211. The instant claim presents just such a situation. Absent some other allegations supporting contemporaneous existence of an inventory overvaluation, the representations in the Prospectus are not actionable as matter of law.

### 3. The "Broad Product Line"

The Class next claims that the Prospectus contained misleading statements by representing that Number Nine offered a broad and diversified range of products.

---

14. It should be noted that *Friedberg* deals with a Section 10(b) claim, and thus the plaintiff was required to meet the Rule 9(b) pleading standard as well as the PSLRA standard relating to scienter. *See Friedberg*, 959 F.Supp. at 47. As explained above, however, the First Circuit has held that a similar test applies to claims under Section 11 that attempt to allege misleading statements based solely on subsequent events. *See supra* note 10 and accompanying text.

At the outset, it is important to examine the challenged statement:

> The Company's product line addresses both mainstream and high-end segments of the PC video/graphics accelerator subsystem market. A broad product line not only allows the Company to serve as a single-source supplier for OEMs seeking to streamline the procurement of video/graphics solutions, but also facilitates the penetration of the retail channel by spanning a range of prices, beginning at $150 and extending to $2,000.

The Class does not challenge the factual assertions contained in this statement. Instead, the Class contends that the statement amounts to a claim by Number Nine that it offers "a broad line of products appealing to consumers at all levels of the market for graphics accelerators." Pl. Mem. at 39. This implicit representation was false and misleading, in the Class' view, because at the time it was made: (a) Number Nine's competitors were offering significantly less expensive alternatives to Number Nine's high-priced Imagine 128 products that offered features such as 3–D graphics and superior motion video which were not available in Number Nine's products; and (b) the second generation Imagine II line of products, which Number Nine touted in the Prospectus as an example of its broad product line, was experiencing numerous difficulties in technical development that Number Nine knew would preclude it from meeting its announced 1995 shipment date.[15] The Defendants counter that the "broad product line" representation is not actionable because: (a) the Defendants had no obligation to disclose the information that allegedly rendered the statement misleading; (b) the Complaint specifically "bespoke caution" with respect to the nature of Number Nine's product line; (c) as matter of law, the statements regarding the introduction of the second generation Imagine 128 product cannot be misleading because they specifically disclaimed certainty of timing; and (d) the "broad product line" statement constitutes an innocuous characterization upon which no reasonable investor could have relied.

The Defendants' first two arguments collapse quickly. First, the Defendants rely on an incomplete statement of the controlling law when they argue that Number Nine had no obligation to disclose the information that allegedly rendered the "broad product line" statement misleading. The Defendants claim that, even if Number Nine's competitors did offer superior products at a lower price, Number Nine was under no obligation to disclose this information. *See In re Syntex Corp. Sec. Litig.*, [1993 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,747, at 97,-569, 1993 WL 476646 (N.D.Cal. Sept. 1, 1993) ("A company has no duty to disparage its own competitive position in the market . . . ."). While it is true that the federal securities laws "do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably," *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir.1994) (citation omitted), they do impose a duty to provide complete and accurate disclosure once a company decides to make a given claim, *see Lucia v. Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir.1994) ("[W]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate."). Thus, the cases upon which the Defendants rely also state that an issuer is only absolved

---

**15.** The Class also claims that the statement is misleading because Number Nine's inventories were overstocked with 64–bit VL Bus products which were becoming obsolete. Because even the direct inventory representations are nonactionable, however, *see supra* Section III(C)(2), they are also nonactionable here through a statement that indirectly relies on them. Moreover, even if the inventory representations were actionable, they would not render the "broad product line" statement any less of a "puffing" claim incapable of influencing a reasonable investor.

from disclosure "where it has provided accurate hard data from which analysts and investors can draw their own conclusions ...." *In re Syntex*, Fed. Sec. L. Rep. at ¶ 97,569; *accord In re Worlds of Wonder*, 35 F.3d at 1419 (issuer relieved of duty only when it "fully disclosed ... sales" and "[t]his disclosure revealed a significant decline in both net sales and net income"); *In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 375 (1st Cir.1993) (when issuer fully and accurately disclosed debt-equity ratio, it was not required to make comparisons with other casinos). Because the Class alleges that relevant material information was *not* disclosed in connection with Number Nine's "broad product line" claim, it is not enough for the Defendants simply to argue that they are under no duty to explicate the state of their product line vis a vis their competitors.

Equally unavailing is the Defendants' "bespeaks caution" argument. The "bespeaks caution" defense is inapplicable where, as here, the plaintiffs challenge the truthfulness of a claim regarding *present facts* as opposed to forward-looking statements. *See Shaw*, 82 F.3d at 1213 ("To the extent that plaintiffs allege that the reserve 'adequacy' statement encompasses [a] representation of present fact, and that such a representation was false or misleading when made, the surrounding cautionary language could not have rendered the statement immaterial as a matter of law."). Because the challenged statement claims that Number Nine *was currently* offering a "broad product line," and the Class contends that the statement was misleading *at the time it was made*, the "bespeaks caution" doctrine is inapplicable.

The defense is available, however, against the Class' contention that Number Nine falsely claimed that the second generation of Imagine 128 cards would be introduced in 1995. In truth, Number Nine merely stated that "[i]n late 1995, the Company *plans to introduce* a second generation of video/graphics products

based on enhancements to the Imagine 128 architecture." Prospectus at 34 (emphasis added); *see also id.* ("There can be no assurance, however, that the Company will be successful in developing, manufacturing and marketing second generation Imagine 128 products"). Under these circumstances, cautionary language regarding a *planned* target date for introducing a complex, technical new product is simply not actionable. "Especially where, as here, a product is understood to be in development, plaintiffs may not assert merely that, because the product did not come out when projected, plans for an earlier release were false." *Berliner v. Lotus Dev. Corp.*, 783 F.Supp. 708, 710 (D.Mass.1992) (Tauro, C.J.) (dismissing Section 10[b] claim under Rule 9[b]). The Class' attempts to distinguish *Berliner* are unavailing. First, as noted above, *see supra* Section III(C)(2), in certain situations the First Circuit applies a heightened pleading standard under Section 11 despite the inapplicability of Rule 9(b). Second, contrary to the Class' assertion, the Complaint does not allege "*specified* developmental problems" in addition to the subsequent announcement of delays. Pl. Mem. at 41 n.50 (emphasis added). Rather the Complaint merely asserts, without the slightest factual support, that Number Nine was experiencing developmental problems at the time of the Offering. Chief Judge Tauro rejected just such a bootstrap approach in *Berliner*. *See Berliner*, 783 F.Supp. at 710. Thus, the Court holds that the "broad product line" statement is nonactionable insofar as the Class relies on the projected introduction of second generation Imagine 128 cards to demonstrate the falsity of the statement.

To rebut the remaining ground for the Class' claim—that the "broad product line" statement was misleading in the absence of disclosures regarding the superiority of competitors' product—the Defendants rely on the simple argument that the "broad product line" statement was so innocuous that, as matter of law, there is no "sub-

stantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The Court accepts this argument and rules that the "broad product line" statement is nonactionable on any ground because it is a subjective characterization that any reasonable investor would perceive as harmless and standard corporate hyperbole.

As the First Circuit said in *Shaw:*

[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*Shaw,* 82 F.3d at 1217. One commentator recently advocated a two-step analysis of such "puffery" claims: first, the court should consider whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information; second, the court should ask whether the statement was also considered unimportant to the total mix of information by the market as a whole. *See* R. Gregory Roussel, Note, *Securities Fraud or Mere Puffery: Refinement of the Corporate Puffery Defense,* 51 Vand. L.Rev. 1049, 1064–66 (1998) (citing *Shaw,* 82 F.3d at 1217). If the answer to either of these questions is no, the puffery defense ought not apply.

The careful reader will note that this analysis depends on the unstated assumption that securities markets sometimes fail to achieve rational equilibria; that is, even well-functioning securities markets sometimes do not achieve in the aggregate what a "reasonable" investor would achieve individually. Otherwise, there would be no need for the second step of the analysis. Some commentators disagree with this proposition, arguing that the evolutionary forces of the market "drive out" behavior that does not replicate economic ideals: "Often [business managers] thrash about quite innocent of economic theory. No matter. Those who offer what consumers want—by design or by accident—and produce it at low cost will prosper. Rewards and punishments arise automatically in any market system." Frank H. Easterbrook, *The Supreme Court, 1983 Term—Foreward: The Court and the Economic System,* 98 Harv. L.Rev. 4, 8 (1984).

Despite the theoretical appeal of this argument, it is hardly surprising that markets sometimes fail to exhibit perfectly wealth-maximizing behavior, given the plethora of evidence from cognitive psychologists and decision theorists suggesting that humans frequently behave in nonrational ways, and that these "cognitive biases" are largely incapable of being unlearned. *See generally* Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: The Problem of Market Manipulation,* 74 N.Y.U. L.Rev. 632 (1999) (providing an overview of such findings). Moreover, the problem is particularly acute in market settings, given that certain actors in the market will have strong incentives to exacerbate and exploit nonrational behavior. *See id.;* Nathaniel Carden, *Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency,* 65 U. Chi. L.Rev. 879 (1998) (suggesting that, following enactment of the PSLRA, the efficient capital markets hypothesis ought play no role in the fraud-on-the-market theory). Thus, the two-step analysis is necessary to ensure that corporate puffery truly is harmless to the market, in addition to being unimportant to the hypothesized "reasonable" investor.

Number Nine's "broad product line" statement is just such " 'puffing' or sales talk upon which no reasonable person could rely," *Shaw,* 82 F.3d at 1217 n. 32

(analogizing from common law fraud), and upon which the market in this case did not in fact rely. Notably, the Class does not challenge any of the specific factual assertions made in the "broad product line" statement; that is, the Class does not challenge that Number Nine offered products for the high-end and mainstream customer, or that it offered products at prices ranging from $150 to $2,000. Instead, the Class' only quibble with the statement is the *implicit* meaning that they attribute to the phrase "broad product line." The Court holds, however, that the phrase is incapable of supporting such an inference, as any reasonable investor would recognize the phrase simply as bullish corporate grandstanding.[16] Moreover, the record tends to negate any possible inference that the market as a whole relied upon the "broad product line" statement in valuing Number Nine shares. Given that the Prospectus contained five pages of specific Number Nine product descriptions, it can hardly be said that the market lacked relevant information to rebut any (unreasonable) implications investors may have drawn from the statement. Thus, the "broad product line" statement is nonactionable under the doctrine of "corporate puffery."

### 4. *The Potential to Increase Margins*

■ The Class next contends that Number Nine and the other Defendants misled investors by overstating Number Nine's expected profitability from its main product offerings. Specifically, Number Nine stated in its Prospectus that margins could increase through: (a) potential cost reductions from efficiency gains and volume purchasing; (b) potential changes in product mix toward a greater concentration of higher-margin products like the Imagine 128 line; and (c) potential changes in its distribution methods. *See* Compl. at ¶ 45. The Class believes that these representations were false and misleading because: (a) Number Nine's margins were certain to decline in light of the impending inventory markdown; (b) Number Nine's proposed Imagine 128 card for the Apple PowerMac was experiencing significant production delays that would cause Number Nine to lose millions of dollars of high-margin sales through its failure to fill outstanding orders; and (c) Number Nine knew that it was unable to procure needed DRAM and VRAM memory chips from its normal suppliers, and instead had to turn to the much more expensive "spot market" for the parts. *See id.* at ¶ 47.

■ The Court rules this statement nonactionable because the "bespeaks caution" doctrine clearly applies in this instance. Immediately following the challenged statement in the Prospectus came this disclaimer: "There can be no assurance, however, that the Company will be able to increase or even maintain current margin levels." *Id.* at ¶ 45. When a forward-looking statement is "accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently," the statement is nonactionable. *Shaw*, 82 F.3d at 1213. Put differently, "if a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a

---

**16.** The Class claims that "the federal reporters are teeming with cases in which alleged misrepresentations that were less concrete and significant than defendants' 'broad product line' statement have been found actionable." Pl. Mem. at 43 n.53. Each of the cases cited by the Class is easily distinguishable, however, on the ground that it refers to allegations of specific, verifiable facts, rather than subjective opinions such as those reflected in the Number Nine statement. *See,* *e.g., Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1334 (7th Cir.1995) ("products were coming down on their cost curves"); *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 364 (1st Cir.1994) ("[W]e have directed specific resources to each of those loans"); *Mayer v. Mylod,* 988 F.2d 635, 636 (6th Cir.1993) (defendant "had implemented a program to improve the quality of its operations," and its value was "fairly reflected on the balance sheet.").

matter of law." *Id.* The Court holds that the "increased margins" statement was sufficiently disclaimed by the cautionary language contained in the sentence immediately following it such that a reasonable investor would not view the statement as material. *See Suna*, 107 F.3d at 70 (no reasonable investor would rely on statement that "the company believes" it will have certain favorable "opportunities"); *Rand v. Cullinet Software, Inc.*, 847 F.Supp. 200, 211 (D.Mass.1994) (Wolf, J.) (statement that company saw "the opportunity for the company to return to normal revenue and profit growth" was "not itself material").[17]

Alternatively, even if the "bespeaks caution" doctrine were not applicable, the challenged statement is still nonactionable because none of the allegations offered by the Class render the "increased margin" statement misleading. The purported obsolescence of the 64–bit VL Bus inventory, besides being insufficiently supported by factual allegations, *see supra* Section III(C)(2), is irrelevant to the assertion that Number Nine might increase margins by achieving a "greater proportion of sales from higher-margin products incorporating Imagine 128 technology." Compl. ¶ 45.

The alleged production delays with the Imagine 128 for PowerMac product are also unrelated to the claim made in the Prospectus. The Prospectus does not even mention the PowerMac product in any of its provisions, let alone in the "increased margin" statement. Indeed, the Prospectus only refers to "products incorporating Imagine 128 technology, which began volume shipment in the fourth quarter of 1994." Compl. ¶ 45. Thus, because the statement unambiguously refers to existing Imagine 128 products, it cannot be misleading due to alleged delays in the introduction of the PowerMac product.[18] Finally, the Class alleges that Number Nine's inability to obtain a steady and inexpensive source of memory chips rendered the "increased margin" statement misleading when made. Unlike the more specific claims regarding the availability of memory supplies, *see infra* Section III(C)(5), this aspect of the memory issue *was* negated by a specific and applicable disclaimer.[19] Thus, it cannot be used here to render the "increased margin" statement misleading.

For the foregoing reasons, the Court rules that the "increased margin" statement is nonactionable.

17. The Class contends that the cautionary language contained in the Prospectus was not specific enough to immunize the "increased margins" statement. Admittedly, "a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Kline v. First Western Gov't Sec., Inc.*, 24 F.3d 480, 489 (3d Cir.1994) (citation omitted). The disclaimer at issue here, however, was not such a general warning. It immediately followed the analysis of three factors that management believed could lead to increased margins. As such, the disclaimer clearly warned that those three factors might not eventuate, or that margins might not increase—indeed might even decrease—due to other factors.

18. The Class contends that the failure to produce Imagine 128 for PowerMac cards on time nevertheless "deprived Number Nine of precisely the type of high-margin sales to which [D]efendants referred." Pl. Mem. at 46 n. 58. To the extent that Number Nine allegedly lost an opportunity to achieve even

greater increased margins due to the PowerMac delays, the Class' claim is one for *mismanagement*, not misrepresentation. Mismanagement claims are not actionable under the federal securities laws. *See Shaw*, 82 F.3d at 1206 ("[A]llegations of mismanagement[ ] ... [are] not cognizable under the securities laws.").

19. That is, because the forward-looking statement in the Prospectus related to the *future* possibility of increasing margins on Number Nine products, the relevant consideration is whether the Prospectus adequately warned of the possibility of *future* memory shortages, including the possibility that the alleged present memory shortage would persist to impede the future possibility of increasing margins. The parties do not dispute that the Prospectus adequately warned of the possibility of future memory shortages. *See* Compl. ¶ 47 ("Any shortage of specialized VRAM or DRAM or other components in the future could materially adversely affect the Company's business and operating results.").

### 5. *The Supply of Memory Chips*

Finally, the Class contends that Number Nine failed to disclose its present inability to obtain needed memory chips from its ordinary suppliers at the time of the Offering. In the Prospectus, Number Nine did disclose that memory shortages "have from time to time required the Company to obtain memory from distributors or on the 'spot market' at higher than anticipated prices," and that "[a]ny shortage of [memory chips] in the future could materially adversely affect" results. Compl. at ¶ 47. Number Nine did not disclose, however, that (as alleged by the Class) it was experiencing just such a shortage of supply at the time the Prospectus was signed and the Offering was made. Due to this nondisclosure, the Class alleges that the "representations concerning the Company's ability to procure VRAM and DRAM memory chips and the 'potential' effect of a shortage of such components upon the Company's operations were materially misleading." *Id.* at ¶ 48.

The Defendants rely on the "bespeaks caution" doctrine in their request for dismissal on this issue. The "bespeaks caution" doctrine, however, cannot be invoked to immunize the Defendants' failure to disclose the alleged *present* difficulties in obtaining memory components. *See In re Convergent Tech. Sec. Litig.,* 948 F.2d 507, 515 (9th Cir.1991) (noting that liability may attach when defendants warn of a contingency that has already occurred); *Friedberg,* 959 F.Supp. at 47 (defendants' representation that "others could introduce new products that would render Discreet's existing products obsolete" was materially misleading because the defendants "failed to disclose that such a product ... had already been created by [a competitor]").

The more important question is thus whether the Complaint has made sufficient allegations to allow the inference that Number Nine was experiencing memory shortages at the time of the Prospectus and Offering. The Complaint alleges the following facts:

(a) By the time the Registration Statement became effective ... Number Nine was experiencing an inability to obtain DRAM and VRAM chips from the Company's usual sources of supply. . . .

(b) By the time of [the Offering], Number Nine was increasingly resorting to the "spot market" for VRAM and DRAM memory chips . . . .

(c) The spot market prices that Number Nine was being forced to pay for VRAM and DRAM memory chips significantly exceeded the prices the Company had paid in the recent past for such components . . . .

(d) The increased costs for procuring memory chips ... could only be passed on to customers to a limited extent.

(e) In addition, the Company's inability to secure adequate supplies of DRAM and VRAM memory chips was preventing Number Nine from shipping products that would otherwise have been delivered to customers and booked as revenue.

Compl. ¶ 48. All of these facts, however, are premised solely on information and belief. As such, they must meet the PSLRA requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b). This raises the issue, also raised above with respect to the allegations regarding inventory obsolescence, of what *precisely* is the pleading standard for Section 11 claims following the PSLRA. For reasons that will be explained, this Memorandum adopts a slightly different standard with respect to the memory shortage allegations than the inventory obsolescence allegations.

One puzzling aspect of the First Circuit's *Shaw* opinion is its repeated emphasis that, under Section 11 claims in which Rule 9(b) does not apply, the factual allegations of the complaint must be accepted

as true. *See Shaw*, 82 F.3d at 1207 ("[W]e accept arguendo the complaint's allegations ..."); *id.* at 1211 ("Accepting, *as we must*, the plaintiffs' allegation ....") (emphasis added). Despite tipping its hat to the conventions of Rule 12(b)(6) analysis, however, the First Circuit indicated that *some* factual allegations need not be accepted as true on a motion to dismiss, namely those allegations in which "the relationship between the nonpublic information ... and the actual results or events that the undisclosed information supposedly would have presaged [is] so attenuated that the undisclosed information may be deemed immaterial as a matter of law." *Id.* at 1211. An unresolved issue for district court judges is whether this latter pleading test needs to be applied to *all* factual allegations in Section 11 claims, or only those which, like the disastrous third quarter results in *Shaw*, involve allegedly nondisclosed information that is functionally equivalent to internal projections or predictions (to which a duty of disclosure does not ordinarily attach). *See id.* As the *Shaw* court noted:

> In such circumstances, where the allegedly undisclosed information is sufficiently remote in time or causation from the ultimate events of which it purportedly forewarned, the plaintiff's claim of nondisclosure may be indistinguishable from a claim that the issuer should have divulged its internal predictions about what would come of the undisclosed information.

*Id.*

▪ This Court will only apply the strict standard to factual claims involving the alleged nondisclosure of information premised on a subsequent announcement or disclosure of such information. More specifically, in a Section 11 case to which Rule 9(b) does not apply, the heightened requirements of *Shaw* only apply when the alleged nondisclosure (or affirmative statement allegedly made misleading by the nondisclosure) conceptually dovetails with a matter of internal projection. Obvious examples include the claim in *Shaw* that disastrous third quarter results should have been foreseen and disclosed in an announcement made prior to the end of the quarter, and the claim in this case that at the time of the Offering, Number Nine and the Defendants should have disclosed the obsolete nature of a large portion of Number Nine's inventory. Both of these claims are premised solely on a subsequent announcement by the defendants and both involve, essentially, a charge that the announcement should have been made earlier. As such, they address matters of projection or forecast to which a stricter standard of pleading attaches.[20]

The Class' allegations regarding Number Nine's inability to obtain memory supplies at the time of the Offering are accepted as true because they relate to a specific, verifiable fact that should get the benefit of the classic dismissal standard, rather than a matter of judgment or projection that should trigger the heightened *Shaw* analysis. As such, the allegations are sufficient to state a claim for violations of Section 11 of the Securities Act. Warning of past and future memory shortages is actionably misleading when a present memory shortage remains undisclosed. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir.1989) ("There is a difference between knowing that any prod-

---

**20.** Unfortunately, this approach is not enough to reconcile the dissonance noted above with respect to the First Circuit's treatment of the restructuring reserves in *Shaw*. The sufficiency of existing restructuring reserves seems clearly to be a subject of internal projection. Thus, the *Shaw* plaintiffs' use in their complaint of a subsequent announcement that the restructuring reserves were insufficient *should* have triggered the same "hindsight" analysis that the disastrous third quarter results did. Apparently because the restructuring reserves claim rested on an allegation of affirmative misstatement, rather than nondisclosure, the First Circuit simply accepted the plaintiffs' allegations as true. As discussed above, however, *see supra* Section III(C)(2), hinging the analysis on whether the plaintiffs allege a misleading statement or mere nondisclosure is problematic.

uct-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay."); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 544 (5th Cir.1981), *aff'd in relevant part and rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

### D. The Claim under Section 15 of the Securities Act

■ In the absence of a primary violation, secondary "controlling person" liability cannot exist. *See Suna,* 107 F.3d at 72; *Cooperman,* 1998 WL 953726 at *13 ("Because plaintiffs have failed to state a claim for such a primary violation, they have also failed to state a claim under § 15."). Thus, the Section 15 claim only survives to the extent that the Section 11 claim does— namely, with respect to the limited issue of the alleged nondisclosure of memory shortages.

■ Number Nine also seeks dismissal of the Section 15 claim against defendant Stanley Bialek ("Bialek") on the ground that he is not a "controlling person" for purposes of the statute. As the Class concedes, Bialek resigned from management responsibilities prior to the Offering. *See* Compl. ¶ 18. Nevertheless, the Class contends that it has alleged sufficient other facts to "support a reasonable inference that [Bialek] had the potential power to influence and direct the activities of the primary violator." *Food & Allied Serv. Trades Dep't v. Millfeld Trading Co.,* 841 F.Supp. 1386, 1391 (S.D.N.Y.1994) (quotations omitted). Namely, the Class has alleged that Bialek: (1) was the co-founder of Number Nine and alternated as chief executive officer and chairman until 1993, when he became chairman full-time; (2) served as chairman until one month before the Offering and was chief operating officer until January 1995; (3) was a member of the board of directors at all relevant times; (4) signed the Registration Statement; (5) held some 26.5 per cent of outstanding shares of Number Nine stock immediately prior to the Offering; and (6) sold 650,000 shares in the Offering. *See* Compl. ¶¶ 18, 20, 178.

These facts are more than sufficient to satisfy the requirements of the statute. "In the securities context, control means 'the possession, direct or indirect, of the power to direct or to cause the direction of the management and policies of [an entity], whether through ownership of voting securities, by contract or otherwise.'" *Sheinkopf v. Stone,* 927 F.2d 1259, 1270 (1st Cir.1991) (quoting 17 C.F.R. § 230.405 [1990]). "Moreover, the question of whether the Individual Defendants exercised sufficient control over [a corporation] is an inherently factual question improper for resolution on a motion to dismiss." *Simon v. American Power Conversion Corp.,* 945 F.Supp. 416, 435 (D.R.I.1996). Thus, the Court holds that the suit may continue against Bialek as a "controlling person."

### E. The Claim under Section 10(b) of the Exchange Act

The remaining claims are brought only against Number Nine and the Insiders (which will hereinafter be referred to together as, "Number Nine"). Because Rule 9(b) applies to claims under Section 10(b) of the Exchange Act, *see Shiva,* 27 F.Supp.2d at 274, the Class' claims under the Exchange Act must be scrutinized more carefully than the claims under the Securities Act. Specifically, the Complaint must specify (1) the statements that the Class contends were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See Suna,* 107 F.3d at 68. Likewise, under the PSLRA the Class must set forth "each statement alleged to have been misleading,

the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, in order sufficiently to allege scienter, the Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2).

### 1. *The Value of Inventory*

In addition to the allegations regarding misleading aspects of the Prospectus, the Class alleges that several post-Offering financial statements and press releases contained misleading information due to Number Nine's refusal to markdown its 64–bit VL Bus inventory when such inventory allegedly had become obsolete. *See* Compl. ¶¶ 52, 57. These reports—which came out on July 27, 1995 and October 25, 1995—were still too temporally remote from the eventual January 31, 1996 announcement regarding inventory markdowns to survive dismissal without additional factual support. In this case, however, the Class has offered such support. In an attempt to allege sufficient scienter, the Class has identified a number of computer industry trade publications that prominently noted, well before the Offering and the post-Offering statements, that VL bus graphics cards were rapidly becoming obsolete.[21] *See id.* at ¶¶ 143–45. Although the Class intended these publications to support a "strong inference" of intent, as required by First Circuit precedent, the evidence can also be used to substantiate the claim that the VL Bus inventory was obsolete at the time the challenged statements were made, as required under the heightened pleading standards of Rule 9(b) and the PSLRA.

The Class has alleged that Number Nine made a number of statements, including financial representations, that were misleading because Number Nine carried 64–bit VL Bus graphics cards on their books at inflated values. Under the Section 11 claim, the Class supported this factual claim only by pointing to the eventual charge for obsolete inventory taken by Number Nine some eight months after the Offering. Accordingly, the Court held that insufficient facts had been alleged to support an inference that the VL Bus inventory was obsolete at the time of the Offering. Here, however, the Class has alleged widespread industry knowledge that the fate of the VL Bus graphics card was already sealed at the time of the Offering. For example, a November 7, 1994 article is quoted as saying, "The PCI Bus will continue gaining market share ... with the VL Bus slowly fading away." *Id.* at ¶ 144. Likewise, a January 1995 article read, "As Intel pushes Pentium prices down, PCI goes along for the ride. VL Bus eventually joins EISA in the aftermarket niche," while a February 1995 opined, "In general, the industry is moving toward the PCI specification, and for that reason the newest and hottest graphics cards appear first (and sometimes only) for PCI." *Id.* Although these trade publication articles do not state that VL Bus cards were obsolete at the time Number Nine made allegedly misleading statements, they do lend credence to the theory that the value of VL Bus inventory was declining even at the time of the Offering. As such, the Court holds that the Class has sufficiently specified why the challenged statements were fraudulent and has relied "on more than information and belief in doing so." *Shiva,* 27 F.Supp.2d at 276 (citing 15 U.S.C. § 78u–4[b][1] ).

A separate question is whether the Class has sufficiently alleged scienter. As this Court has held, evidence of "motive and opportunity" is insufficient to satisfy the requirement that the Complaint "state

---

**21.** These allegations were specifically excluded from the Class' claim under Section 11 (apparently because the Class was concerned about having the Section 11 claim "sound in fraud").

with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" under Section 78u–4(b)(2) of the PSLRA. *Id.* at 281. Instead, the Class must offer specific facts that raise a strong inference that Number Nine acted intentionally or recklessly when making allegedly false statements. *See id.* at 282. The Court holds that the above-referenced trade publication excerpts satisfy the pleading requirement with respect to scienter. Accepting their contents as representative of industry knowledge, the excerpts show that Number Nine either knowingly misrepresented the value of VL Bus inventory at the time it made the challenged statements, or recklessly disregarded such facts by failing to remain informed of important developments in the market for graphics cards.

Thus, the Court DENIES the motion to dismiss as to statements allegedly made misleading by the failure to disclose the overvaluation of inventory.[22]

### 2. *The Supply of Memory Chips*

▮ In addition to the representations contained in the Prospectus discussed above, *see supra* Section III(C)(5), the Class also challenges Number Nine's July 27, 1995 statement that "[g]ross margin improvement was dampened as a result of unanticipated price increases for DRAM and VRAM memory chips during June, which resulted in higher costs." Compl. ¶ 59. The Class contends that this statement was misleading because such difficulties in obtaining memory chips were occurring much earlier than June, and because

"when a corporation does make a disclosure—whether it be voluntary of required—there is a duty to make it complete and accurate." *Lucia,* 36 F.3d at 175 (quotations omitted). This argument fails, however, because the Class has not shown how the July 25, 1995 statement could be misleading based on a failure to disclose the alleged earlier difficulties of obtaining memory chips.

The Class has contended that the July 25 statement was misleading because: (1) increased memory costs had occurred earlier than June; (2) Number Nine had been resorting to the "spot market" earlier than June; (3) Number Nine had not uncovered any prospects for a contractual supply of memory chips by July 25; and (4) the inability to obtain memory chips was so severe that Number Nine could not fill orders, including key orders to its largest customer. Reasons one, two, and four fail because the July 25 statement does not in any way address, let alone negate, those facts. The July 25 statement merely discloses that Number Nine had difficulty obtaining memory chips in June, and that the difficulty had hurt margin improvements. Whether Number Nine additionally had trouble filling orders or had experienced memory shortages before June is not addressed in the July 25 statement, and such factors are *not* necessary to make the July 25 statement "complete." Reason three fails because Number Nine made no representations that it had uncovered prospects for a steady supply of chips. The July 25 statement merely stated that Number Nine was "actively work-

---

22. Of course, it is anomalous to hold a category of representations actionable under Section 10(b) but nonactionable under the more lenient standard of Section 11. Such results will become more frequent, however, under the Byzantine pleading code established in recent years by Congress and the courts for securities actions. As evidenced by this case—in which the Class inadvertently excluded evidence necessary for the survival of its Section 11 claim (apparently in an overly-cautious effort to avoid characterization of the claim as "sounding in fraud")—the

gamesmanship required to plead a successful securities claim has taken on a dimension reminiscent of pre-Federal Rules pleading practice. *See* Richard L. Marcus, *The Puzzling Persistence of Pleading Practice,* 76 Tex. L.Rev. 1749, 1753 (1998) (noting that the "multilayered pleading extravaganza that had typified common law procedure" has resurfaced to a degree in securities litigation). Putting aside the question of whether such regression is provident, it explains the otherwise anomalous result reached in this case.

ing with memory suppliers to secure pricing and volume commitments for future production." Compl. ¶ 59. Moreover, Number Nine emphasized that "there can be no assurance that commitments will be secured in sufficient amounts to meet the increasing needs of the Company." *Id.* The statement therefore cannot be rendered misleading by an allegation that "Number Nine had not ... uncovered any prospects," Pl. Mem. at 57, since Number Nine never represented that it had.

That leaves the allegations noted above with respect to the Section 11 claim. Like the allegations of inflated inventory valuations, the memory chip allegations must be supported by particularized facts other than mere "information and belief." Here, the Class supports the alleged inability to obtain memory chips by again referencing computer industry trade publications. For instance, a March 3, 1995 article stated, "On the spot market, the shortage has pushed the price of DRAM chips ... to as much as 60 percent higher than in current contracts." Compl. ¶ 159(a). Likewise, a May 1, 1995 article observed, "The anticipated memory crunch hit the channel last month with some memory suppliers hiking DRAM prices as much as 10 percent in response to constrained supplies from Japan and a spike in spot ·market prices." *Id.* at 159(d). Unlike the media articles discussed above with respect to the inventory issue, however, these articles cannot carry the day for the Class. One can infer something about the value of Number Nine's VL Bus inventory based on general statements about the declining demand for such products. One cannot, however, infer that Number Nine lacked a reliable supply source for memory chips based on general statements about tightening in that market. The reported memory crunch would have had little impact on Number Nine if the company had commitments or other

reliable sources in place.[23] Thus, one cannot conclude that Number Nine experienced a shortage of memory supplies or turned to the spot market based solely on the trade publication articles offered by the Class. With no other allegations to support such an inference, the Class' claim with respect to the alleged memory shortage must be dismissed for failing to comply with the requirement that particular facts be alleged to show why a statement was misleading. *See Shiva*, 27 F.Supp.2d at 274–75.

### 3. *The Imagine 128 for PowerMac*

The Class alleges that August 7, 1995 and September 26, 1995 press releases issued by Number Nine were materially misleading inasmuch as they stated a target release date that the company knew it could not meet. Specifically, the August 7 press release noted that "[v]olume shipments [of the Imagine 128 for PowerMac] are currently anticipated to begin in September 1995." Compl. ¶ 62. Number Nine actually began shipment in November 1995. *See id.* at ¶ 63(a).

This claim fails as matter of law because the statements regarding the anticipated release date cannot be deemed materially misleading. Notably, the August 7 press release only stated that shipments are *"anticipated* to begin in September 1995." *See id.* at ¶ 62 (emphasis added). Moreover, the September 26 press release stated, "Number Nine expects to ship significant volumes of its new high-performance graphics cards *before the end of the year,"* *id.* at ¶ 66 (emphasis added), a target which, by the Class' admission, Number Nine met. It simply cannot be the case that a statement regarding an "anticipated" launch date that turns out to be optimistic by two months is *materially* misleading. *Cf. Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204,

---

**23.** Although the Prospectus disclosed that Number Nine had no guaranteed agreements with suppliers, *see* Prospectus at 6–7, that does not necessarily mean that Number Nine *had* to turn to the spot market for memory chips. To the extent that it does, the Class' claim would fall victim to the "bespeaks caution" doctrine, given that the issue complained of was expressly disclosed.

213 (4th Cir.1994) (statement that capital improvement project was "on schedule" was immaterial as matter of law because "a 'reasonable investor' knows that [such a] project may run into unforseen problems and delays"); *In re Starter*, 1996 WL 406624, \*5 (where prospectus stated that company "anticipate[d]" project to be completed by a certain date, "[a] reasonable investor should have anticipated a possible delay"). Moreover, even if such a statement were deemed materially misleading, the Class has failed to support with even a single fact the contention that Number Nine was experiencing production delays at the time the statements were made or that the company knew these delays would prevent meeting the September shipment target. As such, the claim fails to allege a materially misleading statement supported by a sufficient factual predicate.

#### 4. *The Imagine 128 Price Cuts*

 The Class contends that an August 25, 1996 press release unveiling price reductions in Number Nine's product line was misleading because it falsely attributed the price cut to the "[w]idespread success of the Imagine 128 to date [which enabled] the company, through economies of scale, to make these substantial price reductions." Compl. ¶ 64. The Class argues that the price cuts were instead necessitated by competitive pressures and that it was misleading to suggest otherwise. *See* Pl. Mem. at 60. Regardless of whether this argument could successfully show a *materially* misleading statement, the claim must be dismissed because the Class has failed to allege a single fact to support it, barring those facts based solely upon information and belief. The Class does reference another paragraph of the Complaint in support of its contention that Number Nine's products were at a severe competitive disadvantage to other manu-

facturers. That paragraph, however, is also based solely upon information and belief. "[P]laintiffs cannot simply predicate their beliefs on other allegations that themselves are based solely on information and belief." *Shiva*, 27 F.Supp.2d at 276–77. Thus, the Court dismisses the Class' claim with respect to the Imagine 128 price cuts.

#### 5. *The Third Quarter 1995 Results*

The Class challenges a number of statements made in Number Nine's October 6 and October 25, 1995 announcements regarding third quarter results. Specifically, the Class argues that Number Nine was wrong to state that "we currently expect that OEM sales will increase significantly in the fourth quarter" and that "order backlog [amounted to] $22 million at the end of September." Compl. ¶¶ 70, 71.[24] These statements, however, were accompanied by extensive cautionary language: "The volume and timing of orders during a quarter [are] very difficult to forecast, however, and attaining a specific sales level cannot be assured," *id.* at ¶ 70; "We *currently expect* that OEM sales will increase ...," *id.* (emphasis added); "A key factor affecting fourth quarter sales growth will be our ability to obtain sufficient VRAM supplies ...," *id.* at ¶ 73; "[A]ttaining a specific sales level cannot be assured," *id.* at ¶ 80.

 Thus, the statements regarding expected sales growth in the fourth quarter are not actionable. "The statements ... indicate that [the defendant] projected positive future earnings, but these statements were tempered with language indicating that [the defendant] did not, and could not, guarantee the future profitibability of the company. 'Soft,' 'puffing' statements such as these generally lack materiality because the market price of a

---

24. The Class also challenges two other statements from the October press releases. These statements, however, relate to Number Nine's plan to address the memory chip supply problem and the target introduction date for the

Imagine 128 for PowerMac. For the same reasons discussed *supra* Sections III(D)(2)-(3), the Court holds these statements nonactionable.

share is not inflated by vague statements predicting growth." *Suna*, 107 F.3d at 72 (citing *Raab v. General Physics Corp.*, 4 F.3d 286, 289 [4th Cir.1993] ). The Class contends that such statements *can* be actionable when accompanied by "facts known by [the defendant], and contemporaneous with the [challenged statements], that would show that [the defendant's] anticipated success was unlikely." *Id.* at 70. That may be true, but the Class has not alleged any such facts, apart from a series of self-referencing allegations based on nought but information and belief. Such bootstrapping is insufficient under the PSLRA and the pleading standards long in effect in the First Circuit. *See Shiva*, 27 F.Supp.2d at 276.

The statement regarding the $22 million backlog of orders is alleged to be misleading because some of those orders comprised Imagine 128 for PowerMac orders that would go unfilled due to production delays. As noted above, however, the Class has failed to allege any facts sufficient to raise an inference that Number Nine was aware, at the time it made the challenged statements, that the PowerMac product would experience production delays, or that those delays would result in an inability to fill orders.

Thus, the Court rules all statements contained in the October 1995 press releases nonactionable.

### 6. *Statements Made by Securities Analysts*

■ The Class also seeks to impose liability on Number Nine for various statements made by securities analysts. The majority of courts to address the issue have adopted an "entanglement" test under which a company may be held liable if it has sufficiently entangled itself with the analyst who made the challenged statements. *See In re Boston Tech., Inc. Sec. Litig.*, 8 F.Supp.2d 43, 55 (D.Mass.1998) (Lasker, J.) (discussing law of "several Courts of Appeals"). "Courts concluding that an issuer may be liable under the statute for failure to correct an analyst

statement have generally required that the plaintiff allege that: (1) the issuer 'entangled' itself in the making of a statement by the analyst; (2) the issuer knew that the statement (commonly a prediction) was false or lacked a reasonable factual basis when made; and (3) the issuer failed to disclose the falsity or the unreasonableness to investors." *Id.*

The First Circuit has yet to rule on the issue of whether a company may be held liable for statements made in analysts' reports. *See Suna*, 107 F.3d at 73. Assuming that the "entanglement" test does apply, the First Circuit has indicated that allegations of entanglement must satisfy the heightened pleading requirements of Rule 9(b). *See id.; see also Shiva*, 27 F.Supp.2d at 280 ("Even assuming … that an analyst's statements could be attributed to a company, any allegation that the company made misrepresentations to the analyst must survive the Rule 9[b] standard."); *In re Boston Tech.*, 8 F.Supp.2d at 55 ("Applying the requirements of Rule 9[b] to the law [of "entanglement"], a plaintiff is required to allege with particularity the time, place, content and speaker of the issuer's communications with the analysts, and explain why the communications were fraudulent.").

Moreover, although the First Circuit has yet to rule on whether a company may be held liable for statements made in analysts' reports, it has provided an example of the level of conduct that does *not* suffice to establish a prima facie case of liability. *See Suna*, 107 F.3d at 73. In *Suna*, the First Circuit rejected the following allegations as insufficient to satisfy the heightened pleading requirements in a securities fraud case, which this Circuit has been "especially rigorous" in applying, *id.*:

> [I]t was the Company's practice to have top managers, namely, Chief Financial Officer Heilman, communicate regularly with securities analysts … to discuss, among other things, the Company's earnings prospects, its products, the effi-

ciency of the Company's manufacturing plants, anticipated financial performance, and to provide detailed "guidance" to these analysts with respect to the Company's business, including projected revenues, earnings, and of particular importance to analysts, earnings per share.

*Id.*

The Class contends that its allegations go further than those rejected in *Suna* by identifying "specific documents and information (e.g., earnings projections) that were provided to analysts," and alleging "a pattern of continuous interactions among" Number Nine and the analysts. Pl. Mem. at 64. Unfortunately for the Class, the first of these distinctions is not true, and the second is not sufficient. The Complaint does attempt to identify specific categories of documents that the analysts may have reviewed. For instance, the Complaint alleges that the Underwriters (some of whom also provided analyst services to Number Nine) had access to Number Nine's "financial projections," "minutes of the meetings of the Number Nine board of directors," "income statement and balance sheet information," and Number Nine's "most important contracts." Compl. ¶ 83. Identifying *categories* of documents, however, does not satisfy the requirement that the Class "allege with particularity the time, place, content and speaker of the company's communications with the analysts, and explain why the communications were fraudulent." *Shiva,* 27 F.Supp.2d at 280. Likewise, although the Complaint does allege "a pattern of continuous interactions among" Number Nine and the analysts, Pl. Mem. at 64, such allegation scores no points under Rule 9(b), the purpose of which is to provide defendants with notice of the specific allegations brought against them. *See Shiva,* 27 F. Supp.2d at 274. If plaintiffs could clear the Rule 9(b) hurdle simply by injecting general allegations of "a pattern of continuous interactions," the cynical acid

of Rule 9(b) would be so diluted as to lose its force.

Thus, the Court GRANTS the motion to dismiss insofar as it relates to statements made by analysts. *See* Compl. ¶¶ 83–107.

### F. *The Claim Under Section 20(a) of the Exchange Act*

██ In the absence of a primary violation, secondary "controlling person" liability cannot exist. *See Cooperman,* 1998 WL 953726 at *13 ("Because plaintiffs have failed to state a claim for such a primary violation, they have also failed to state a claim under § 15."); *Suna,* 107 F.3d at 72 (same). Thus, the Court holds that the Section 20(a) claim only survives to the extent that the Section 10(b) claims does—namely, with respect to the limited issue of the alleged nondisclosure of inventory obsolescence.

### IV. *Conclusion*

For the foregoing reasons, the Court GRANTS the motions to dismiss (Docket numbers 23, 25, 27) except insofar as they relate to (1) the alleged memory shortage under Sections 11 and 15 of the Securities Act, and (2) the alleged inventory overvaluation under Sections 10(b) and 20(a) of the Exchange Act.

So it is that, after 78 pages of dense prose, the parties will now shift from arguing the adequacy of what the Class says happened, and turn instead to the truly expensive aspect of case preparation, discovering what actually happened. *See* James S. Kakalik et al., *RAND: An Evaluation of Judicial Case Management Under the Civil Justice Reform Act* 89 (1997); *see also* James S. Kakalik et. al., *Discovery Management: Further Analysis of the Civil Justice Reform Act Evaluation Data,* 39 B.C. L.Rev. 613, 634–41 (1998). Perhaps this is modern litigation at its best. One wonders, however, whether some narrowly-focused discovery limited to internal corporate documents and taken before ruling on this motion to dismiss might not have held down the ultimate costs. *Com-*

*pare* Elliott J. Weiss & Janet E. Moser, *Enter Yossarian: How to Resolve the Procedural Catch–22. That the Private Securities Litigation Reform Act Creates,* 76 Wash. U.L.Q. 457, 501 (1998) (arguing for limited judicially-authorized discovery before a motion to dismiss) *with* Hillary A. Sale, *Heightened Pleading and Discovery Stays: An Analysis of the Effect of the PSLRA's Internal–Information Standard on '33 and '34 Act Claims,* 76 Wash. U.L.Q. 537, 579 (1998) (arguing that such discovery, while desirable, will require legislative authorization).