Thomas H. MEYER, Raymond Collins, Gregory Cusanno, John L. Hall, William Gresher, Eliot Jack Shevel, Mary E. Fulton and Paul F. Willis, Plaintiffs,

v.

BIOPURE CORPORATION and Carl W. Rausch, Defendants.

No. Civ.A. 02–10194–EFH.

United States District Court, D. Massachusetts.

Sept. 4, 2002.

David L. Kelstrom, Adkins, Kelston & Zavez, P.C., Boston, MA, D. Brian Huford, Pomerantz, Haudek, Block, Grossman & Gross, LLP, New York City, for Thomas H. Meyer, Gregory Cusanno, John L. Hall, Mary Hall.

Susan E. Stenger, Perkins, Smith & Cohen, Boston, MA, Robert I. Harwood, Wechsler, Harwood, Halebain & Feffer, LLP, New York City, D. Brian Huford, Pomerantz, Haudek, Block, Grossman & Gross, LLP, New York City, for Raymond Collins.

Noah N. Rosmarin, Adkins & Kelston, Boston, MA, David L. Kelstrom, Adkins, Kelston & Zavez, P.C., Boston, MA, D. Brian Huford, Pomerantz, Haudek, Block,

Grossman & Gross, LLP, New York City, for William R. Gresher, Elliott Jack Shevel, Mary E. Fulton, Paul F. Willis.

Thomas J. Dougherty, Matthew J. Matule, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Biopure Corp., Carl W. Rausch.

### MEMORANDUM AND ORDER

HARRINGTON, Senior District Judge.

Plaintiffs brought this securities class action on behalf of investors who purchased shares of Defendant Biopure Corporation ("Biopure") between May 8, 2001 and March 21, 2002, alleging that Biopure violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 promulgated thereunder by failing to disclose defects in data gathered during clinical trials for Biopure's experimental blood substitute, Hemopure, and by telling investors that it would file a Biologic License Application ("BLA") for Hemopure with the Food and Drug Administration ("FDA") by the end of 2001 when it could not do so. (Docket No. 38.) Plaintiffs also allege that Defendant Carl W. Rausch is liable as a control person under Section 20(a) of the Exchange Act. Defendants move to dismiss the case because the statements regarding the timing of the BLA filing are protected by the Private Securities Litigation Reform Act ("Reform Act") safe harbor for forward-looking statements, and because the allegations regarding Biopure's failure to disclose defects in the clinical trials do not meet the particularity or scienter requirements of the Reform Act.

### I. FACTS

The facts are taken from the amended complaint and the documents integral to or incorporated in the amended complaint. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996).

Defendant Biopure, a Delaware corporation headquartered in Cambridge, Massachusetts, manufactures oxygen therapeutics, a new class of pharmaceuticals which deliver oxygen to the body's tissues. Complaint ¶ 11. Defendant Rausch is a co-founder of Biopure and has served as Chairman and Chief Executive Officer since 1994, and was President of Biopure from 1984 until July 1, 1999. ¶ 12. Biopure manufactures two products. One product, Oxyglobin, is used to treat anemia in dogs. ¶ 23. The second product, Hemopure, has not been approved by the FDA, but is designed to eliminate or reduce red blood cell transfusions in patients undergoing orthopedic surgery. ¶ 24.

Biopure must get FDA approval in order to market Hemopure in the United States. To get FDA approval, a company must conduct human clinical trials that establish the safety and efficacy of the product, submit a BLA, and undergo FDA review. ¶ 13. The clinical trials are conducted in three phases. In Phase I, the treatment is tested primarily for safety. Phase II evaluates the efficacy of the treatment and dosage in a limited patient population, as well as safety. In Phase III, the treatment is given to large groups to confirm its effectiveness, monitor side effects, compare it to commonly used treatments, and collect information that will allow the treatment to be used safely. ¶ 15. Phase III is the final level of clinical testing before filing a BLA.

Biopure began a Phase III clinical trial for Hemopure in March 1999. The objective of this trial was to avoid red blood cell transfusions for six weeks after orthopedic surgery. Biopure designed the trial to enroll a total of 640 patients in the United States, Europe, Canada and South Africa, of whom approximately one-half received Hemopure and the other half received red blood cells. ¶ 24. In the trial, up to 300

grams of hemoglobin, or ten units of Hemopure, were infused before, during, or after surgery, for a total of up to six treatment days. The efficacy endpoint of this trial was the elimination of red blood cell transfusions in 35 percent of the patients who received Hemopure. Another endpoint was a safety profile that was no worse than the control group. ¶ 25.

On January 12, 2000, Biopure announced that it had reached the mid-point of its Phase III trial and, based on an independent panel's review of the safety data gathered at the halfway mark, would continue to enroll patients in the study. ¶ 27. On July 14, 2000, Biopure announced that the Phase III trial had reached an "enrollment milestone," having enrolled more than 640 patients. ¶ 28. Final enrollment in the Phase III trial was ultimately 693 patients. ¶ 24. In an interview published August 3, 2000 in *The Wall Street Transcript,* Defendant Rausch stated that Biopure "has manufacturing capacity to meet initial commercial demand following regulatory approval." ¶ 29.

On September 6, 2000, Biopure announced that it had completed enrollment in the Phase III trial, and that it was the first company to complete a trial that directly compared oxygen therapeutics to red blood cells. Defendant Rausch stated that "The design of this study, combined with the strength of data from previous trials and a growing number of compassionate use cases, make us confident that our pivotal trial results will support the filing of marketing applications in the United States and other major markets." ¶ 30.

On December 13, 2000, Biopure announced its financial results for the fourth quarter of 2000 and the fiscal year. The press release stated in pertinent part:

In August, Biopure became the first company to complete patient enrollment in a pivotal U.S. Phase III trial that directly compares the use of an oxygen-carrying solution to red blood cell transfusion, in this case in orthopedic surgery. Biopure's clinical contractors are now querying the patient data. When the database is final, the data will be analyzed for safety by an independent study panel, as required by the study protocol, and Biopure will prepare a final study report for inclusion in its marketing applications for Hemopure. The company plans to announce the preliminary Phase III trial results in early 2001 after first reviewing them with the FDA. ¶ 31; Def.App.Ex. 18 at 3.

On January 8, 2001, Biopure announced that it expected "to sign a letter of intent in January for asset-based debt financing of a large-scale manufacturing facility, and is proceeding with preparations to file a[BLA] in 2001 for its investigational product Hemopure." The release also stated that Biopure's existing manufacturing facility in Cambridge, Massachusetts was then-currently being expanded to accommodate an approximate production capacity of 100,000 Hemopure units per year. ¶ 32.

On May 8, 2001, the commencement of the class period, Biopure issued a press release which stated:

"These preliminary efficacy results reaffirm Hemopure's ability to meet patients' oxygen requirements when compatible red blood cells are not readily available or when there is a need or preference to avoid blood transfusions," said Biopure Chairman and Chief Executive Officer Carl Rausch. "We expect that this pivotal trial will lead to the filing of marketing applications in the United States and Europe as the next steps in our worldwide commercialization strategy for Hemopure following the product's recent approval in South Africa."

Biopure is preparing to file an electronic biologic license application (eBLA) in the United States in 2001, followed by an application in Europe in 2002, for perioperative use of Hemopure to eliminate or reduce red blood cell transfusions in patients undergoing elective surgery.

During patient enrollment in the Phase III orthopedic surgery trial, an independent data monitoring committee (IDMC) evaluated patient data to determine if there were safety issues warranting modification or early termination of the study. During the past few months, the company's clinical contractors have collected, queried and organized the patient data for analysis by a separate, independent safety endpoint evaluation committee (SEEC) as required by the study protocol. This SEEC analysis will determine if the primary safety endpoint has been achieved. At the conclusion of this analysis, Biopure will lock the trial database and prepare a final study report for inclusion in its marketing applications. The company intends to report the safety and final efficacy results in a peer-reviewed forum after it has submitted the data to the U.S. Food and Drug Administration.

\* \* \* \* \* \*

On April 6, 2001, South Africa's Medicines Control Council approved Hemopure for the treatment of acute anemia and avoidance of red blood cells in adult surgery patients.... Hemopure will be launched on a commercial basis in South Africa during the first half of 2002, after Biopure completes the expansion of its Cambridge, Mass. manufacturing facility.

¶ 37; Def.App.Ex. 2.

A May 22, 2001 press release, announcing financial results for the second fiscal quarter ending April 30, 2001, reiterated much of what the May 8 release stated:

Biopure is preparing to electronically file marketing applications in the United States in 2001 and Europe in 2002 for perioperative use of Hemopure in patients undergoing elective surgery. In May, the company announced preliminary efficacy results from a pivotal Phase III clinical trial showing that the product eliminated the need for red blood cell transfusion throughout the six-week study period in a majority of patients undergoing elective orthopedic surgery. Only patients in need of a transfusion were randomized into the trial. These results exceeded the minimum efficacy criterion specified in the study protocol.

During patient enrollment in the Phase III orthopedic surgery trial, an independent data monitoring committee (IDMC) evaluated patient data to determine if there were safety issues warranting modification or early termination of the study. Patient data has been collected, queried and prepared for analysis for a separate, independent safety endpoint evaluation committee (SEEC) as dictated by the study protocol. This SEEC analysis will independently determine if the trial results meet the primary safety endpoint, which requires a safety profile for the patients receiving Hemopure that is no worse than the safety profile for the control group of patients receiving donated red blood cells. The company intends to report the safety and final efficacy results at a national medical meeting following submission of the data to the U.S. Food and Drug Administration (FDA).

¶ 40; Def.App.Ex. 3 at 2–3.

On June 22, 2001, Biopure announced that it had entered into a $75 million equity financing agreement with Société Generale. In order to obtain funds under this agreement, Biopure had to issue shares of

the company to Société Generale, but could only do so if those shares had a market value of $13 or more. ¶ 41.

On August 22, 2001, Biopure announced financial results for the third fiscal quarter, which ended July 31, 2001. The press release also stated that Biopure would "file a marketing application for Hemopure in the United States in 2001, followed by an application in Europe in 2002." ¶ 42.

On August 27, 2001, Biopure issued another press release touting the safety and efficacy results from the Hemopure trials:

Biopure Corporation (Nasdaq: BPUR) today announced that the primary safety and efficacy endpoints were met in a pivotal Phase III clinical trial comparing the company's oxygen therapeutic Hemopure(R) [hemoglobin glutamer—250 (bovine)] or HBOC–201, to allogeneic (donated) blood transfusion in patients undergoing elective orthopedic surgery. Statistical analyses of the trial data show that the overall medical risk to patients receiving Hemopure was no worse than the risk to patients receiving blood and that the majority of the Hemopure-treated patients totally avoided blood transfusion throughout the six-week study period.

"These results are a win for the company because they meet the study endpoints previously agreed to by the Food and Drug Administration (FDA) and are supportive of our plan to file a marketing application this year," said Biopure Chairman and CEO Carl Rausch. "This clinical milestone is an important step toward addressing the critical issue of blood availability on a worldwide basis." Biopure is preparing the Phase III study report and is assembling an electronic biologic license application (eBLA), for perioperative use of Hemopure in patients undergoing elective surgery, based on data from the pivotal clinical trial and 19 other trials. This

submission to the FDA will exceed 350,-000 pages. The company plans to report further data from the pivotal trial in appropriate medical forums.

¶ 43; Def.App.Ex. 4 at 1.

On November 30, 2001, an internet site called *TheStreet.com* posted an article stating that Biopure was telling institutional investors that its BLA application would be delayed until early the next year. The article also suggested that Biopure had problems managing the clinical trial and was having problems collecting data. ¶ 51; Def.App.Ex. 12.

On December 6, 2001, Biopure issued a press release stating that:

During the past few months, company representatives have held a series of meetings with the FDA to discuss various sections of the proposed BLA. Recent conversations with the FDA regarding Biopure's plan to increase the production capacity of its Cambridge, Mass. manufacturing plant have led to additional facility and process validation requirements for the BLA filing. As a result, the company is targeting the BLA filing for mid–2002 or possibly sooner depending on ongoing discussions with the FDA regarding its specific requirements.

Biopure intends to submit an interim safety report for the pivotal Phase III clinical trial to the FDA by year end . . . .

\* \* \* \* \* \*

Biopure is installing the equipment required to expand the plant's annual capacity to approximately 100,000 Hemopure units and is scheduled to complete the chemistry, manufacturing and controls section of the submission and file the BLA after it has validated the manufacturing process to produce approximately 75,000 Hemopure units per year.

Further validation will be conducted after the BLA filing to achieve the 100,-000–unit capacity following anticipated FDA approval of Hemopure and the Cambridge plant.

¶ 52; Def.App.Ex. 5 at 1–2.

On March 20, 2002, Biopure issued a press release stating that:

The Phase III trial is a multinational, randomized, red blood cell controlled, single-blind, parallel-group study designed to assess Hemopure as an alternative to allogeneic red blood cell transfusion in patients undergoing elective orthopedic surgery. Of the 693 patients enrolled in the study, 350 received Hemopure, 338 received allogeneic red blood cells and 5 were randomized but not treated.

\* \* \* \* \* \*

"These data demonstrate this compound's effectiveness in eliminating the need for red blood cell transfusion in a significant proportion of patients who have experienced blood loss during elective surgery and would otherwise have required allogeneic blood," said Jonathan S. Jahr, M.D., the principal investigator at the University of California Davis Medical Center. . . .

¶ 61; Def.App.Ex. 14 at 1.

Plaintiffs allege that Biopure's press releases were misleading because they failed to disclose defects in the clinical data, and because Biopure falsely stated that its plan was to file a BLA by the end of 2001. Defendants move to dismiss the case because the statements regarding the timing of the BLA filing are protected by the Reform Act safe harbor for forward-looking statements, and because the allegations regarding Biopure's failure to disclose defects in the clinical trials do not meet the particularity or scienter pleading requirements imposed by the Reform Act.

## II. *ANALYSIS*

### A. *Statutory Safe Harbor*

■ The Private Securities Litigation Reform Act was enacted in 1995 to "curb abuse in private securities lawsuits, particularly the filing of strike suits." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 (1st Cir.1999). The Reform Act created a statutory safe harbor requiring dismissal of any suit based on omissions or misrepresentations in forward looking statements which are accompanied by meaningful cautionary language. 15 U.S.C. § 78u–5(c)(1). The defendants argue that to the extent that this suit alleges that the May 8, May 22, August 22, and August 27, 2001 statements that Biopure was preparing to file a BLA in the United States in 2001 were false because Biopure did not file in 2001, ¶¶ 92–97, it must be dismissed because the safe harbor applies.

■ Under the Reform Act, the definition of a forward looking statement includes "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer[.]" 15 U.S.C. § 78u–5(i)(1)(B). It also includes "any statement of assumptions underlying or relating to" those plans or objectives. 15 U.S.C. § 78u–5(i)(1)(D). Biopure's statements of its plan to file a BLA in the United States by the end of 2001 clearly fall under this definition. The press releases at issue also contained the following cautionary language:

Statements in this press release that are not strictly historical may be forward-looking statements. There can be no assurances that Biopure Corporation will be able to commercially develop its oxygen therapeutic products, that necessary regulatory approvals will be obtained, that any clinical trials will be successful, or that any approved product

will find market acceptance. Actual results may differ from those projected in forward-looking statements due to risks and uncertainties that exist in the company's operations and business environment. These risks include, without limitation, the company's stage of product development, history of operating losses and accumulated deficits, and uncertainties related to clinical trials, regulatory approval, manufacturing and market acceptance. The company undertakes no obligation to release publicly the results of any revisions to these forward-looking statements to reflect events or circumstances arising after the date hereof. A full discussion of Biopure's operations and financial condition, and specific factors that could cause the company's actual performance to differ from current expectations, can be found in [the company's filings with the U.S. Securities and Exchange Commission, or through the Investor section of Biopure's web site.]

Def.App.Exs. 2–4. This cautionary language identifies the risks at issue in the complaint and immediately follows the paragraphs where Biopure states its intention to file its BLA in 2001. Therefore, the safe harbor prevents the plaintiffs from bringing an action based on these forward-looking statements accompanied by meaningful cautionary language. *See In re PLC Sys., Inc. Sec. Litig.,* 41 F.Supp.2d 106, 117–18 & n. 7 (D.Mass. 1999); *see also Fitzer v. Sec. Dynamics Techs., Inc.,* 119 F.Supp.2d 12, 31 (D.Mass. 2000) (applying the same analysis under the "bespeaks caution" doctrine); *In re Number Nine Visual Tech. Corp. Sec. Litig.,* 51 F.Supp.2d 1, 19, 21–22 (D.Mass. 1999) (same).

### B. *Pleading Requirements for Fraud and Scienter*

Plaintiffs are correct, however, in asserting that not all of the allegations in the complaint fall under the safe harbor. Some of the allegations in the complaint are based on misrepresentations of historical fact. For these statements, the Reform Act imposes a pleading requirement which is "congruent and consistent" with the First Circuit's preexisting Rule 9(b) jurisprudence in securities fraud cases. 15 U.S.C. § 78u–4(b)(1), (2); *Greebel,* 194 F.3d at 193. The First Circuit has been especially rigorous in applying the Reform Act and Rule 9(b) pleading requirements because of "concern that plaintiffs will bring baseless strike suits against securities defendants in order to increase settlement amounts or to engage in a fishing expedition for evidence...." *Suna v. Bailey Corp.,* 107 F.3d 64, 73 (1st Cir.1997). To survive a motion to dismiss, a complaint alleging securities fraud must (1) specify each statement alleged to have been misleading, including its time, place and content; (2) provide factual support for the claim that the statement is misleading; and (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1); *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 78 (1st Cir.2002).

Then, the complaint must, with respect to each act or omission, state with particularity facts giving rise to a *strong* inference that the defendant acted with intent to deceive, manipulate, or defraud, or with a high degree of recklessness. 15 U.S.C. § 78u–4(b)(2); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Aldridge,* 284 F.3d at 82. This is different from the usual Rule 12(b)(6) standard, under which inferences drawn in the plaintiffs' favor must merely be *reasonable* to survive. *Greebel,* 194 F.3d at 195–96. Although the pleading requirements are

heightened, the Court must still draw all reasonable inferences in the plaintiffs' favor from the facts pleaded with particularity. *Aldridge,* 284 F.3d at 78. At the same time, the Court "need not credit a complaint's bald assertions or legal conclusions." *Shaw,* 82 F.3d at 1216 (internal quotations omitted).

### 1. *Failure to Disclose Defects in the Clinical Data Collected*

■■■ Plaintiffs allege that the May 8, May 22, and August 27, 2001, and March 20, 2002 press releases were misleading because by May 8, 2001, the Hemopure clinical trial had been completed, the data had been subjected to rigorous analysis, and the defendants were aware of significant problems with the data which they failed to disclose. ¶¶ 33–36. The plaintiffs plead this based on investigation of counsel. "Pleading based on investigation by counsel is similar to pleading on information and belief; the complaint must specify the facts upon which the information is based." *Van Ormer v. Aspen Tech., Inc.,* 145 F.Supp.2d 101, 104 (D.Mass.2000). The sources of this information are two articles by Adam Feuerstein on the internet site *TheStreet.com,* dated November 30, 2001 and March 21, 2002. ¶¶ 33–35, 51, 63–64; Def.App., Exs. 12, 13. Although the plaintiffs assert that the complaint is also based on interviews with former employees of Biopure, former consultants engaged in work for Biopure, and consultation with experts, the complaint sets forth no information or sources, other than those included in the *TheStreet.com* articles, to support the allegations that Biopure's press releases were misleading. While plaintiffs are not required to name their sources, the facts pleaded must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Fitzer,* 119 F.Supp.2d at 22,

*quoting Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir.2000). Since no other source is described, other than the articles and the sources quoted within the articles, the articles themselves must provide a sufficient factual basis to meet the standards of the Reform Act and Rule 9(b). *See Van Ormer,* 145 F.Supp.2d at 104; *Fitzer,* 119 F.Supp.2d at 22.

■■■ The November 30, 2001 article suffers from a number of infirmities which prevent it from providing a sufficient factual basis to satisfy the pleading requirements. Much of the article is written in a speculative tone, and plaintiffs have simply re-characterized selective portions of the speculation as fact, without any additional pleaded basis. The article also contains opinions and conclusions regarding the management of the Phase III trial from two "independent consultants hired by Biopure to assist with its pivotal trial for Hemopure[.]" Def.App.Ex. 12 at 1. One of the consultants had "10 years of experience working in clinical trials[,]" but stopped working for Biopure approximately one year before the article was written. *Id.* at 3. Another consultant, or perhaps the same consultant, "supervised multiple sites." *Id.* at 2. With such a limited description, it is difficult to determine whether these consultants were in position to possess the information they discuss in the article. *See Novak,* 216 F.3d at 314; *Fitzer,* 119 F.Supp.2d at 22.

The "facts" obtained from the consultants and included in the article tell little about the consultants' knowledge, and are largely conclusory: that Biopure decided against holding a meeting of all doctors involved at the beginning of the trial, and instead sent employees to individual sites, resulting in "little consistency with how doctors collected data[;]" that Biopure was "totally unprepared" for the size of the Phase III trial, and experienced "a nightmare[;]" that the consultant who left a

year earlier still answers calls from clinical sites needing help to reverify patient information, and that some of the data "appears incorrect or is simply missing[;]" that the data "will not be strong enough to support FDA approval[;]" and that Biopure "should have gone back to the drawing board and started over when they realized their problems[.]" Def.App.Ex. 12 at 2–3. To the limited extent that these are facts rather than conclusions or opinions, they are simply not specific enough to satisfy the plaintiffs' pleading burden. There is no factual explanation of precisely what data appears incorrect or simply missing, or why the data will not be strong enough to support FDA approval. Furthermore, the Court cannot speculate that, because former consultants themselves experienced problems, Biopure executives must have had knowledge of the problems in compiling the data and fraudulently concealed them. See *Fitzer*, 119 F.Supp.2d at 24. Simply put, no portion of the November 30, 2001 article identifies in a manner that meets the Reform Act and Rule 9(b) pleading standards any particular problems with the data that should have been disclosed.

 The March 21, 2002 article also fails to provide a sufficient factual basis to satisfy the Reform Act and Rule 9(b) pleading standards. The article is based on Mr. Feuerstein's analysis of a chart that accompanied a March 20, 2002 presentation by Jonathan S. Jahr, M.D., the principal investigator at the University of California Davis Medical Center, at the annual meeting of the International Anesthesia Research Society in San Diego. ¶¶ 34, 64;

Def.App.Exs. 1, 13. A copy of the data presented by Doctor Jahr is included in the defendants' appendix, Def.App.Ex. 1, and the Court may consider it since it provides the factual underpinning for a conclusion drawn in the article and relied on in paragraph 64 of the complaint. See *Shaw*, 82 F.3d at 1220. The article states that the chart shows that baseline blood pressure data from 6 percent of the participants in the study, and critical blood pressure readings for over 35 percent of the participants, were not included in the analysis presented at the meeting and summarized in the March 20, 2002 Biopure press release. ¶¶ 34, 64; Def.App.Ex. 13. Yet the chart states that "[b]oth the safety and efficacy analysis sets included all 688 treated patients." Def.App.Ex. 1 at 1. Mr. Feuerstein did not attend the presentation itself, nor does he purport to have medical training or familiarity with the study protocol, yet his conclusions are based on his own analysis of the medical data. Def. App.Ex. 13 at 1. Because of this, the Court has grave concerns that the information in the article does not come from someone in a position to understand the data. See *Novak*, 216 F.3d at 314; *Fitzer*, 119 F.Supp.2d at 22.

 Even assuming Mr. Feuerstein is in a position to comment on the medical data, he states only that Biopure failed to disclose that some of the data presented by Doctor Jahr came from a subset of the full database. Def.App.Ex. 13. Plaintiffs go beyond the article's scope, asserting that the "missing" data should have been disclosed in the March 20 release[1] because

---

1. While the complaint asserts that defendants were aware of the defective or missing data by May 8, 2001, this article was published on March 21, 2002, based on information obtained the previous day. There are no facts pleaded, other than plaintiffs' unparticularized assertion that the data was rigorously analyzed by the start of the class period, that suggest that this information was available to

the defendants at the time of the earlier press releases. "The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity unless the complaint *also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992) (em-

they showed that the study was not "adequate and well controlled" as required by the FDA. ¶ 34. Yet the article states that the patients not included in the safety analysis (the "missing" 35 percent) were not included because doctors were unable to take blood pressure measurements in a manner that would comply with the study's protocol. Since the article also states that Biopure collected this safety data, and that the data would be included in the company's BLA, it appears from the article that it was the study protocol that prevented the blood pressure measurements from being included in the tables during Doctor Jahr's presentation, rather than any failure on the part of the doctors to take the blood pressure measurements in the first place. Def.App.Ex. 13 at 1.

With respect to the baseline blood pressure data alleged to be missing for 6 percent of the patients, the plaintiffs plead no basis for concluding that this factor will in any way impede the progress of Biopure's BLA. While the Court agrees that the study would have been *more* "adequate and well controlled" if there were *no* missing data, the plaintiffs plead no basis for concluding that this missing 6 percent makes the trial *inadequate* under FDA standards. Biopure designed the trial to enroll a total of 640 patients. Ultimately, 693 were enrolled, with 688 receiving treatment. Biopure has baseline blood pressure data for 647 patients, more than Biopure planned to have and the FDA approved at the outset of the Phase III trial. ¶ 24; Def.App.Exs. 1, 13. Plaintiffs' thin suggestion, with no articulation of any

*particular* FDA requirement, that the missing 6 percent shows the study is not "adequate and well controlled" is simply insufficient to satisfy the Reform Act and Rule 9(b) requirements.

Plaintiffs also plead no basis for inferring that it is highly likely that these alleged omissions were either intentional or highly reckless. *See Aldridge,* 284 F.3d at 82. This is not a situation where the facts omitted from the press release are so clearly important that the fact of nondisclosure alone gives rise to a strong inference of scienter, since plaintiffs do not suggest that the "missing" data would show that Hemopure was unsafe or that the "missing" data would otherwise differ in any material manner from the data that was released. The ultimate BLA filing will consist of over 350,000 pages, and there are countless details that have not been disclosed in Biopure's public materials. As Biopure spokesman Brad Miles stated in the March 21, 2002 *TheStreet.com* article, "We could have gone back and forth forever trying to decide what to disclose or not disclose in our press release. Our objective was to highlight significant new safety information, and I think the data speaks for itself." Def.App.Ex. 13 at 2. To state a valid claim for fraud, the plaintiffs would have to plead facts giving rise to a strong inference that this omission was not merely a judgment call about the detail in which the release should describe the medical data. They have not done so.

---

phasis in original). The law in this circuit also clearly prohibits plaintiffs from pleading fraud by hindsight, asserting that if the information was available on March 20, 2002, the defendants must have also known about it in May and August of 2001. *E.g., Gross v. Summa Four, Inc.,* 93 F.3d 987, 991 (1st Cir. 1996); *Shaw,* 82 F.3d at 1223; *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 367

(1st Cir.1994); *Fitzer,* 119 F.Supp.2d at 20. Since there is no pleaded factual basis for inferring that defendants knew in May and August 2001 of the alleged defects that would be known in March, 2002, the May and August 2001 press releases cannot be misleading on the basis of the facts set forth in the March 21, 2002 article.

Plaintiffs also complain that the May, August, and March releases should have disclosed that there was evidence that Hemopure caused blood pressure levels to increase twice as much as the levels of those patients receiving regular blood transfusions. Contrary to plaintiffs' assertions, elevated blood pressure readings for Hemopure patients are disclosed in the fourth paragraph of the March 20, 2002 release. Def.App.Ex. 14 at 1. This disclosure is consistent with previous disclosures of transient and clinically insignificant increased blood pressure results for Hemopure patients as early as Biopure's July 29, 1999 Initial Public Offering Prospectus. Def.App.Ex. 15. Plaintiffs also assert that, contrary to the company's statement that the "modest blood pressure changes were mostly transient and were not clinically significant," Def.App.Ex. 14 at 2, the increases "raised safety concerns." ¶ 63. Plaintiffs plead no factual basis for this conclusion, so it does not satisfy the pleading requirements of the Reform Act and Rule 9(b).

## 2. *Finality of Study Report*

Plaintiffs allege that the August 27, 2001 press release was misleading because it led investors to believe that it had completed the final study report contemplated in its December 13, 2000 press release, and that the results disclosed were from that final analysis. ¶ 43. This is in spite of the fact that the next paragraph in the August 27, 2001 press release, after the portion excerpted in the complaint, states that:

*Biopure is preparing the Phase III study report* and is assembling an electronic biologic license application (eBLA), for perioperative use of Hemopure in patients undergoing elective surgery, based on data from the pivotal clinical trial and 19 other trials. This submission to the FDA will exceed 350,-000 pages. The company plans to report further data from the pivotal trial in appropriate medical forums.

Def.App.Ex. 4 at 1 (emphasis added). Plaintiffs' allegation with respect to this press release can only be sustained if the Court ignores the language of the press release itself.

## 3. *Reason for Delay in Filing Biologic License Application*

█ Plaintiffs allege that the December 6, 2001 release was misleading because it states that the reason for the delayed BLA filing is the additional process validation requirements, rather than the problems in the data as speculated in the November 30, 2001 *TheStreet.com* article. ¶ 52. However, as outlined *supra* Part II.B.1., there is no particularized factual basis for concluding that at the time of the December 6 press release, there were known defects in the data which would delay the BLA filing. In fact, the November 30, 2001 article does not even state a causal connection between the alleged clinical data problems and the filing date; it states that Biopure is saying it will postpone its BLA filing date, and that Biopure was also having problems with the Phase III clinical trials, and speculates that they may be connected. The article does not state as a factual matter that the reason Biopure is privately saying it will postpone its BLA filing is because of its clinical trial problems. Def.App.Ex. 12. The plaintiffs have made this transition from speculation to assertion without pleading any further factual basis, and, as such, fail to meet the requirements of the Reform Act and Rule 9(b).

█ Plaintiffs also claim that Biopure's reasons set forth in the December 6, 2001 release are pretextual, because Biopure could have filed the initial BLA application and completed the process validation on a rolling basis. Plaintiffs also assert that it

is extremely rare for a sponsor to delay an entire BLA application because one component is under discussion and negotiation with the FDA. ¶¶ 54–56. The legality of another filing option which the company chose not to pursue, and the infrequency with which other companies choose to pursue the same option as did Biopure, however, mean little absent some particularized factual basis for inferring fraud.

### 4. *Additional Allegations of Scienter*

In order to state a claim for securities fraud, the complaint must *also*, with respect to each act or omission, state with particularity facts giving rise to a *strong* inference that the defendant acted with scienter. 15 U.S.C. § 78u–4(b)(2). As noted above, plaintiffs do not allege facts with respect to each act or omission that give rise to a strong inference of scienter. Plaintiffs attempt to overcome this with a general, overarching motive, alleging that Biopure was having difficulty raising capital, so it needed to commit fraud in order to secure necessary financing. Specifically, Biopure would not have access to $75 million from the June 22, 2001 Société General agreement unless its shares traded above $13. ¶ 67. On May 7, 2001, Biopure's shares closed at $27–21/32. ¶ 39. In August 2001, Biopure attempted to secure $50 million from private investors, but was only able to secure $20 million before December 7, giving the Société General agreement increasing importance. ¶ 68. On August 27, 2001, Biopure shares closed at $24.55. ¶ 46. After the December 6, 2001 announcement of the postponement of the BLA filing, the shares dropped to below $15 per share. ¶ 57. In February, 2002, with the share price below $13, Biopure acknowledged its need to raise additional capital in order to continue operations beyond fiscal 2003. ¶ 69. On March 20, 2002, Biopure closed at 11.15 per share. ¶ 62. While these facts may establish a motive, evidence of motive and opportunity

is not enough to create a blanket presumption that any omissions were made with intent to defraud; there must be some other indication of knowledge or a high degree of recklessness with respect to each act or omission, which is not pleaded here. *See Aldridge*, 284 F.3d 72, 82; *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir.2001).

### CONCLUSION

For the above reasons, there is no violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Because there is no Section 10(b) violation, there is also no Section 20(a) liability. *Suna*, 107 F.3d at 72. Accordingly, defendants' motion to dismiss is granted.

SO ORDERED.